**In re ANNETTE P. and Elizabeth P.**

Supreme Judicial Court of Maine.

Argued March 5, 1991.
Decided April 10, 1991.

David J. Edgar (orally), Houlton, for appellants.

Timothy Woodcock, Mitchell & Stearns, Bangor, for Intervenor Houlton Band of Maliseet Indians.

Carrie Linthicum (orally), Asst. Dist. Atty., Caribou, Margaret Semple, Asst. Atty. Gen., Augusta, for Dept. of Human Services.

Before McKUSICK, C.J., and ROBERTS, WATHEN, GLASSMAN, COLLINS and BRODY, JJ.

GLASSMAN, Justice.

The parents of Annette P. and Elizabeth P. and the Houlton Band of Maliseet Indians (Houlton Band)[1] appeal from the judgment entered in the District Court (Houlton, *Griffiths, J.*) granting the petition of the Department of Human Services (DHS) to terminate the rights of the parents to their children. The parents do not challenge the court's determination that it is in the best interest of the children that parental rights be terminated. Rather, the parents contend that the court erred in its determination that they were unwilling or unable to protect the children from jeopardy and that these circumstances were unlikely to change within a time that was reasonably calculated to meet the needs of the children. The parents also challenge the court's finding that the DHS actively attempted to provide remedial services and a rehabilitative program designed to prevent the breakup of the Indian family, as required by the Indian Child Welfare Act, 25 U.S.C. §§ 1901–1963 (1978), and that the parents had failed to make a good faith effort to rehabilitate and reunify with the children. Finding no error in the court's record, we affirm the judgment.

In December 1981, when the mother was taken to a hospital in an intoxicated condition and the father[2] was unconscious from abuse of alcohol, leaving Annette P. and Elizabeth P., aged 1 year and 2 years respectively, unattended, the DHS secured a preliminary protection order and removed the children from their home. In June 1982, a final protection order was secured, based on the court's finding that the mother was unable to care for her children without outside supervision and that the father, with whom the mother had resided for 21 years, had severe alcohol abuse problems and had physically abused the children's mother.[3] The mother is a member of the Canadian Maliseet Indian Tribe and has been diagnosed as mildly mentally retarded. The children and their father are members of the Houlton Band of Maliseet Indians, a federally recognized tribe under the provisions of the Maine Indian Claims Settlement Act, 25 U.S.C. § 1727 (1983). Shortly after their removal from their home, the children were placed in the non-Indian foster home where they continue to reside. In 1985, the Houlton Band inter-

---

1. Although the Houlton Band of Maliseet Indians filed a timely notice of appeal, it did not file separate briefs or participate in oral argument.

2. The father first acknowledged paternity of the children in 1985.

3. The father was convicted of an assault on the mother in 1983, but at the time of the hearing in this matter continued to deny any past physical abuse.

vened in the case, pursuant to 25 U.S.C. § 1911(c), and the court subsequently denied the DHS's first petition to terminate the parental rights of the father and mother, but made no explicit findings of fact on the reasons for the denial of the petition.

In 1989, after a failed attempt to reunify the family, the DHS filed a second petition for the termination of parental rights. After two hearings on the matter, the court ordered the termination of the parental rights of both the father and mother. The termination of parental rights is governed by 22 M.R.S.A. § 4055 (Pamph.1990).[4] The court found *beyond a reasonable doubt* that: the termination was in the best interests of Annette P. and Elizabeth P., *see* 22 M.R.S.A. § 4055(1)(B)(2)(a); the DHS had made reasonable efforts to rehabilitate and reunify the family, *see* 25 U.S.C. § 1912(d);[5] the return of custody to the parents would result in "serious emotional and physical damage" to the children, *see* 25 U.S.C. § 1912(f);[6] the parents were unwilling or unable to take responsibility for the children or to protect them from jeopardy and these circumstances are unlikely to change within a time that is reasonably calculated to meet the needs of the children, *see* 22 M.R.S.A. § 4055(1)(B)(2)(b)(i)–(ii); and the parents had failed to make a good faith effort to rehabilitate and to reunify the family. *See id.* § 4055(1)(B)(2)(b)(iv). Both parents and the Houlton Band appeal.

The parents first contend that the court erred in its determination that they were unwilling or unable to protect the children from jeopardy and these circumstances were unlikely to change within a time that is reasonably calculated to meet the needs of the children. Although they conceded at the hearing that they had no present ability to protect the children from jeopardy, they argue that the evidence supports their contentions that they were undergoing regular treatment for their alcohol abuse problems, that construction of their new house was imminent, and that the Houlton Band was prepared to provide them with various outreach programs to assist them in learning to care for the children.

We will affirm a termination order if the court "could reasonably have been persuaded that the required factual findings [were] proved to be *highly probable*," *In re Marcus D.*, 583 A.2d 701, 701 (Me.1990), and will vacate the termination only when the findings amount to clear error. *See In re John Joseph V.*, 500 A.2d 628, 629 (Me.1985). Jeopardy is defined by statute as "serious abuse or neglect, as evidenced by ... deprivation of adequate food, clothing, shelter, supervision or care, including health care when that deprivation causes a threat of serious harm." 22 M.R.S.A. § 4002(6). If a parent has no present ability to protect a child from jeopardy, the court must determine a time reasonably

---

**4.** Section 4055 provides in pertinent part:
> **1. Grounds.** The court may order termination of parental rights if:
> ....
> **B. (2)** The court finds, based on clear and convincing evidence, that:
> **(a)** Termination is in the best interest of the child; and
> **(b)(i)** The parent is unwilling or unable to protect the child from jeopardy and these circumstances are unlikely to change within a time reasonably calculated to meet the child's needs; [or]
> ....
> **(iv)** The parent has failed to make a good faith effort to rehabilitate and reunify with the child pursuant to section 4041.

**5.** Section 1912(d) provides:
> **(d) Remedial services and rehabilitative programs; preventive measures**

> Any party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.

**6.** Section 1912(f) provides:
> **(f) Parental rights termination orders; evidence; determination of damage to child**
> No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

calculated to meet the child's needs and "the time frame which the court is gauging must be seen from the child's perspective." *In re Christopher J.*, 505 A.2d 795, 798 (Me.1986) (citing L.D. 2166, Statement of Fact (111th Legis.1984)). A finding adverse to a parent is especially well founded if the parent has demonstrated no ability to appreciate the child's special physical or emotional needs, *see In re Jeffrey E.*, 557 A.2d 954, 956–57 (Me.1989), or if the child needs the stability of a long-term foster home to overcome the emotional impact of chronic medical problems. *See In re Christopher J.*, 505 A.2d at 800.

Based on the evidence adduced at the hearings in the present case, we find clear and convincing evidence to support the court's determination that both children have special needs and that the stable environment of the foster home has greatly decreased the symptoms of nervousness and emotional distress exhibited by them on their arrival at the foster home. Annette P. still requires a regular schedule of medication, a special diet, and periodic visits to a doctor for treatment of rickets. Elizabeth P., who has been diagnosed as mentally retarded and legally blind, requires special classes and speech therapy at her current school. At the hearing, the parents displayed only a superficial understanding of their children's special needs, and indeed, the mother testified that she had often neglected her *own* medical conditions in the past.

Both parents testified that their past alcohol abuse problems were under control, but the record does not clearly establish the nature of their on-going treatment. While the father had apparently undergone individualized counseling with a substance abuse counselor for the Houlton Band, he had suspended these sessions several years ago, and since that time, both parents only sporadically attended meetings of an alcohol abuse support group, which merely involved showing films to the group about the dangers of alcohol abuse. The DHS produced uncontroverted evidence that the parents continued to reside in a one-room trailer, measuring approximately ten by twelve feet, without running water or electricity. Although federal HUD funds were apparently slated by the Houlton Band for the eventual construction of a new three-bedroom home for the father, unexplained delays in the federal appropriation had indefinitely postponed the construction at the time of the hearings in this matter. Meanwhile, the parents had made little or no effort to secure a more suitable apartment pending that construction. Similarly, a welfare program coordinator for the Houlton Band testified that the outreach services currently operated by the Band's Indian Health Services would not provide the type of daily outside supervision that the parents would require to care for the children. Given this evidence, the court properly determined that the parents' circumstances were unlikely to change within a time reasonably calculated to meet the special needs of the children.

▬ In cases not involving Indian children, our disposition of the parents' first contention would, with the record in this case, support the court's decision to terminate their parental rights. However, the parents also contend that the court erred in its determination that the DHS actively attempted to provide remedial services and a rehabilitative program designed to prevent the breakup of the Indian family, as required by the Indian Child Welfare Act, and that the parents failed to comply with the requirements of 22 M.R.S.A. § 4041(1)(B) (parents not only are responsible for rectifying and resolving problems that prevent return of the child to the home, but must make a good faith effort to cooperate with the DHS in the development and pursuit of a rehabilitation and reunification plan).

▬ Before filing a petition to terminate parental rights, the DHS must attempt to reunify the family by developing a reunification plan that offers services to assist the parents in caring for the children. *See* 22 M.R.S.A. § 4041(1)(A)(1). In cases involving non-Indian children, the failure of the DHS to fulfill its obligations under section 4041 does not, by itself, constitute an independent ground for denying

termination of parental rights, but is only one factor to be considered in evaluating the parents' efforts to rehabilitate. *See In re Daniel C.*, 480 A.2d 766, 770 (Me.1984). Because this case involves Indian children and implicates the federal guidelines set out in the Indian Child Welfare Act, the DHS can only prevail on its petition to terminate parental rights if it "satisf[ied] the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." 25 U.S.C. § 1912(d).[7] Like the determination of the other elements under 22 M.R. S.A. § 4055(1), we will affirm the court's findings if supported by clear and convincing evidence in the record.[8] Although a case of first impression in Maine, courts in other jurisdictions have interpreted this federal standard to require that the State affirmatively prove that all "reasonable" efforts to provide parents with rehabilitative services have been exhausted. *See, e.g., In the Matter of S.D., K.C.H., and L.W.*, 402 N.W.2d 346, 351 (S.D.1987).

The record in the present case discloses that, prior to the court's denial of the first petition to terminate parental rights in 1985, DHS caseworkers visited the mother at her trailer on a weekly basis in an attempt to improve her parenting skills, to provide homemaking services, and to counsel both parents about their alcohol abuse problems. The mother consistently denied that any problems existed and refused to consider the changes recommended by the DHS. No efforts were expended by the DHS for two years following the court's denial of the first petition to terminate parental rights. In January 1987, the caseworker contacted both parents and requested that they come into the DHS office for a consultation. After a renewal of the request by a follow-up visit to the parents' trailer, only the mother attended the proposed meeting. The caseworker testified that the mother informed him that both she and the father were still abusing alcohol, that the father still physically abused her, and that she was concerned for the children's safety if they regained custody. Aware that the mother was mildly mentally retarded, the caseworker decided that he should attempt a very gradual rehabilitation and that the mother should first arrange to undergo an alcohol abuse assessment. The mother signed an agreement to that effect, but she subsequently steadfastly refused to make an appointment for the assessment, despite the caseworker's follow-up visits to the parents' trailer. Although the caseworker repeatedly warned the father that he must become personally involved, the father refused to discuss his participation in any plan for reunification. In July 1987, the DHS ceased any further attempts to rehabilitate or to reunify the family.

While recognizing the laudable policy of the Indian Child Welfare Act to pre-

---

7. This mandatory showing comports with the Act's stated purpose to "promote the stability and security of Indian tribes and families by the establishment of minimum federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and [to provide] for assistance to Indian tribes in the operation of child and family service programs." 25 U.S.C. § 1902, and follows from the legislative finding of fact that "most State laws require public and private agencies involved in child placements *to resort to* remedial measures prior to initiating placement or termination proceedings, but that these services are rarely provided." H.R.Rep. No. 95–1386, 95th Cong., 2d Sess. 22 (1978).

8. Although the court found that this federal requirement was established *beyond a reason-*

able doubt, see, e.g., People in Interst of S.R., 323 N.W.2d 885, 887 (S.D.1982), the federal statute does not explicitly specify the measure of proof necessary for this distinct element. Subsection (f) of section 1912 *does require proof beyond a reasonable doubt* that return of custody to the parents is likely to result in "serious emotional or physical damage" to the children, but no such corresponding requirement is included in subsection (d) dealing with reunification efforts. Because the federal guidelines should be interpreted to change state law to the least extent possible, we determine, under the reasoning of *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), that the DHS must affirmatively establish this element *by clear and convincing evidence* in order to prevail on its petition for a termination of ·parental rights.

serve the integrity of American Indian families, we cannot say that the federal guidelines contained in the Indian Children Welfare Act required the DHS to engage in futile, nonproductive efforts to reunify this Indian family. Although the DHS could have initially developed a more comprehensive plan, outlining the factors enumerated in 22 M.R.S.A. § 4041, it was not unreasonable for the DHS to believe, given the mother's limited mental capacity and past refusal or reluctance to cooperate with the DHS, that she would be more likely to respond to a gradual step-by-step program of rehabilitation. *See People in Interest of P.B.*, 371 N.W.2d 366, 372 (S.D.1985) (although mere fact that parent has limited mental capacity will not justify termination, "Department [is not] charged with the duty of persisting in efforts that can only be destined for failure.") Further, the father's complete refusal to even discuss prospects for reunification suggests that any additional active measures to impose outside assistance also would have been rejected. While a mother's regular visitation with her children is a factor, among others, in the court's consideration of whether she has made a good faith effort to reunify the family, *see In re Howard P.*, 562 A.2d 1224, 1226 (Me.1989), here, the mother's *sole* effort at reunification was the visits with her children. The court heard evidence that the children no longer maintain or wish to reestablish any bond with their mother, that they have a genuine fear of their father, and that they have developed a loving and close relationship with their foster parents. The court properly determined that it was highly probable that the DHS had taken all reasonable active efforts to develop a plan that would reunify this Indian family and properly found that the parents had no real interest in taking *any* meaningful steps to regain the custody of their children.

The entry is:

Judgment affirmed.

All concurring.