MAINE SUPREME JUDICIAL COURT                          Reporter of Decisions
Decision:    2019 ME 73
Docket:      Was-18-180
Argued:      December 12, 2018
Decided:     May 21, 2019

Panel:       SAUFLEY, C.J., and MEAD, GORMAN, JABAR, HJELM, and HUMPHREY, JJ.

IN RE CHILD OF RADIENCE K.

HJELM, J.

[¶1] A mother and father appeal from a judgment of the District Court (Calais, *D. Mitchell, J.*) terminating their parental rights to their child pursuant to Maine's Child and Family Services and Child Protection Act (MCPA), 22 M.R.S. §§ 4001 to 4099-H (2018) and the Indian Child Welfare Act of 1978 (ICWA), 25 U.S.C.S. §§ 1901-1963 (LEXIS through Pub. L. No. 116-8). Both parents challenge the court's determination that "active efforts [had] been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family," as required by ICWA. 25 U.S.C.S. § 1912(d). Additionally, the mother challenges the sufficiency of the evidence supporting the court's determination that she is parentally unfit within the meaning of state law, *see* 22 M.R.S. § 4055(1)(B)(2)(b)(i)-(ii), and the father challenges the court's denial of his two motions to transfer the case to the Penobscot Nation Tribal Court, *see* 25 U.S.C.S. § 1911(b), and the denial of his post-judgment

motion alleging ineffective assistance of counsel, *see* M.R. Civ. P. 60(b)(6).  We affirm the judgment.

## I.  BACKGROUND

[¶2]  The following facts are drawn from the court's findings, which are supported by competent record evidence, and from the extensive procedural record.  *In re Evelyn A.*, 2017 ME 182, ¶ 4, 169 A.3d 914.

[¶3]  The child at issue in this case is an Indian child within the meaning of ICWA.  *See* 25 U.S.C.S. § 1903(4).[1]  The Department first became involved with the family in 2012 when the father was charged with crimes arising from his possession of child pornography on the family computer.  The following year, he was convicted of multiple counts of possession of sexually explicit material (Class C), 17-A M.R.S. § 284(1)(C) (2018).  After the father served the unsuspended portion of the resulting prison sentence, the Department closed the family's case because any contact between the father and the child was to be supervised by the mother.[2]

---

[1] ICWA defines an "Indian child" as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe."  25 U.S.C.S. § 1903(4) (LEXIS through Pub. L. No. 116-8).  The child is a member of the Penobscot Nation and is therefore an "Indian child" within the meaning of ICWA.

[2] The court was presented with evidence showing that, as part of the father's sentence, he was subject to conditions of probation that prohibited him from having contact with children under the age of sixteen, except for supervised contact with his child and the children of friends or family.

[¶4]  The Department became involved with the family again in February of 2016, when it petitioned the court for child protection and preliminary protection orders on behalf of the child, *see* 22 M.R.S. §§ 4032-4034, who was then six years old.  The Department filed the petition after receiving new information that the father had sexually abused a child to whom he is related. The Department knew of the family's affiliation with the Penobscot Nation and, before filing the petition, notified the Nation of its intent to do so.[3]  *See* 25 U.S.C.S. § 1912(a) (requiring that notice be provided to the Indian child's tribe); *see also id.* § 1903(5) (defining "Indian child's tribe").  The court granted the petition for a preliminary protection order and placed the child in departmental custody.  The court also appointed counsel for each parent, *see id.* § 1912(b); 22 M.R.S. § 4005(2), and granted the Penobscot Nation's motion to intervene, *see* 25 U.S.C.S. § 1911(c); 22 M.R.S. § 4005-D(5).

[¶5]  After holding a summary preliminary hearing in March of 2016, the court found that the child was in immediate risk of serious harm and ordered that the child remain in the Department's custody.  *See* 22 M.R.S. § 4034(4). The court also addressed the pertinent provisions of ICWA, finding that active,

---

[3]  Because the child was not living on the reservation when she was placed in the Department's custody, the District Court had concurrent jurisdiction with the Penobscot Nation Tribal Court.  *See* 25 U.S.C.S. § 1911(b) (LEXIS through Pub. L. No. 116-8); *see also Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 60-61 (1989).

4

albeit unsuccessful, efforts had been made to prevent the breakup of the Indian family and that continued custody of the child by the parents would result in serious emotional or physical damage to the child.[4]  *See* 25 U.S.C.S. § 1912(d)-(e).  Soon after the court held the summary preliminary hearing, the father was arrested on charges resulting from the child abuse allegations that had been reported to the Department, and he remained incarcerated throughout the pendency of this child protection action.

[¶6]  In June of 2016, the mother—who was now represented by her second attorney—and the father agreed to a jeopardy order, *see* 22 M.R.S. § 4035, in which the court found, among other things, that the child had made detailed disclosures of inappropriate conduct by the father, that the father posed a threat of sexual abuse or exploitation to the child,[5] and that the mother

---

[4] Evidence in the record indicates that a few days after the summary preliminary hearing, the child was placed with her current foster parents, one of whom is a member of the Passamaquoddy Tribe and, at the time of the child's placement, was thought to be a distant relative of the child. Though it was later discovered that the foster parent is biologically unrelated to the child, both the Penobscot Nation's caseworker and its designated expert witness testified that the placement of the child with these foster parents is considered by the Penobscot Nation to be a placement with "extended family."  *See* Penobscot Nation Laws and Ordinances, ch. 15, subch. 1, § 2(16) (2016) (defining "extended family" to include "individuals [who] are unrelated by either birth or marriage, who have an emotionally significant relationship with the [child] that would take on the characteristics of a family relationship").

[5] During the jeopardy hearing, when asked about the pending sexual abuse charges, the father asserted his Fifth Amendment privilege against self-incrimination, and from this the court drew an adverse inference against him.  *See* M.R. Evid. 513(b); *In re Ryan M.*, 513 A.2d 837, 841-42 (Me. 1986).

had failed to protect the child from the risk of sexual abuse or exploitation posed by the father.

[¶7] In the months after the court entered the jeopardy order, counsel for each parent filed a motion to withdraw. The court granted the motions and appointed new counsel for each parent.

[¶8] A contested judicial review hearing began in February of 2017. *See id.* § 4038. Shortly thereafter, the father's second attorney filed a motion to withdraw. The court granted the motion and appointed the father his third attorney. In late March of 2017, before the second day of the judicial review hearing was held, the Department filed a petition to terminate the parental rights of each parent. *See id.* § 4052. On the Department's motion, the court consolidated the termination hearing with the ongoing judicial review hearing. *See* M.R. Civ. P. 42(a).

[¶9] In early June of 2017, each of the parents' third attorneys filed a motion to withdraw. The court granted both motions and assigned the father new counsel; the mother initially stated that she wanted to represent herself but eventually petitioned the court to appoint a new attorney. During the transition of counsel, the parents filed a number of joint motions pro se, which the court addressed at a hearing held on a date in July when the consolidated

6

hearing had been scheduled but was continued by the court because of the recent change in the parents' representation.

[¶10]    Because of circumstances unrelated to this appeal, the now-consolidated hearing on the termination petition and the judicial review was not rescheduled to begin until December 4, 2017.  Just prior to that date, on November 28, the father filed a motion for the case to be transferred from the District Court to the Penobscot Nation Tribal Court pursuant to ICWA.  *See* 25 U.S.C.S. § 1911(b); 25 C.F.R. § 23.115 (2018).  The Nation and the child's guardian ad litem each filed a written objection to the transfer.[6]  The court held a hearing on the motion on the first morning of the consolidated hearing and, after receiving evidence, denied it, stating:

> The Court finds that this proceeding is at an advanced stage and that the father did not act promptly to request the transfer after he received notice of the action. . . . He's had a desire to request a transfer for a long time[,] according to his testimony.
>
> . . . [E]ven assuming that his prior attorneys were indeed not responsive, he's demonstrated an ability on his own to file his own motions.

---

[6]  As the court noted at the motion hearing and as we were advised during oral argument, the Penobscot Nation's objection to the father's motion to transfer does not necessarily mean that the Tribal Court would have declined to accept transfer of the case.  Neither the mother nor the Department took a position on the father's motion to transfer.

[¶11]  The court then proceeded with the hearing on the termination petition and judicial review, which took place over six days from December of 2017 through February of 2018.  The court heard testimony from a number of witnesses, including the mother and the father; caseworkers from the Department and the Penobscot Nation Department of Social Services; therapists for the mother and the child; one of the child's foster parents; and a qualified expert witness, as ICWA requires, designated by the Penobscot Nation, *see* 25 U.S.C.S. § 1912(f); 25 C.F.R. § 23.122 (2018).

[¶12]  On April 19, 2018, the court entered a judgment granting the Department's termination petition.  Addressing the standards set out in the MCPA, the court found by clear and convincing evidence that each parent was unwilling or unable to protect the child from jeopardy or take responsibility for the child and that those circumstances were unlikely to change within a time reasonably calculated to meet the child's needs.  *See* 22 M.R.S. § 4055(1)(B)(2)(b)(i)-(ii).  The court also found by clear and convincing evidence that termination of each parent's parental rights is in the best interest of the child. *See id.* § 4055(1)(B)(2)(a).  Then, applying the provisions of ICWA, the court found that the Department had proved by clear and convincing evidence that active remedial efforts had been made to prevent the breakup of

the Indian family and that those efforts had proved unsuccessful, *see* 25 U.S.C.S. § 1912(d), and also that the Department had proved beyond a reasonable doubt that continued custody of the child by the parents was likely to result in serious emotional or physical damage to the child, *see id.* § 1912(f)—a conclusion supported by the testimony of the Nation's ICWA-mandated expert witness.

[¶13]  In its judgment, the court made the following findings of fact, all of which are supported by competent record evidence.

> Mother has failed to demonstrate through her conduct that she understands the risk posed by the Father and that she is able to protect the child.
>
> . . . Mother permitted [Father to have] unsupervised contact [with the child,] which, based on the child's disclosures, enabled Father to watch naked pictures or movies with the child while naked.  Despite engaging in counseling and the Non Offenders Group, something she did on an inconsistent basis, Mother continued to maintain contact with the Father, calling him daily and visiting him on weekends during his incarceration to discuss this case. . . . Mother's actions speak much more loudly than do her words and the court does not find her testimony credible.
>
> The Department through its various case workers offered rehabilitative services and attempted on numerous occasions to maintain contact with the mother, who at times was simply not around and who rarely maintained contact with the Department herself. . . . The Department made referrals to counselors, held family team meetings, and took efforts to ensure that Mother understood what was expected of her. . . . [Mother] is in no better position now to safely parent the child, protect the child from jeopardy and take responsibility for the child than she was when the case began.  These circumstances are not likely to change

within a time reasonably calculated to meet the child's needs, particularly when the child has been in care since February 2016.

. . . [The jeopardy order] found that Father "poses a threat of serious harm to the child . . . in particular a threat of sexual abuse or exploitation" . . . based on his criminal convictions and the current criminal allegations involving a young relative. [The psychologist] who conducted the CODE [court-ordered diagnostic evaluation] and whose testimony the court finds credible, found . . . that Father "either lacks an ability to understand or acknowledge the jeopardy he poses to a child sexually and to the pathological power and control as well as potential exploitation he has over a vulnerable child." . . . Significantly, the evidence also supports a finding that Father carries a diagnosis of pedophilia, a condition that is exceedingly difficult to treat if at all, particular[ly] from a jail, where Father has been since essentially the outset of this case.

. . . .

In this case, reasonable or active efforts[7] to provide services designed to prevent the breakup of the family would

---

[7] In *In re Annette P.*, 589 A.2d 924 (Me. 1991), we affirmed a judgment terminating parental rights to Indian children, stating that "all *reasonable* active efforts" had been made to prevent the breakup of the Indian family. *Id.* at 929 (emphasis added). After we issued that opinion, the federal Bureau of Indian Affairs issued a rule, 25 C.F.R. § 23.2 (2018) (the Final Rule), and non-binding guidance, Indian Child Welfare Act Proceedings, 81 Fed. Reg. 38,778, 38,790-91, 38,825 (June 14, 2016) (to be codified at 25 C.F.R. pt. 23), that addressed the standard for assessing "active efforts." The BIA's non-binding guidance notes that the "active efforts" standard is different than a "reasonable efforts" standard, which is contained in many state child protection laws. *See* Indian Child Welfare Act Proceedings, 81 Fed. Reg. at 38,791; *see also, e.g.*, 22 M.R.S. § 4036-B (2018) (requiring the Department to "make reasonable efforts to prevent removal of the child from home"); *In re Child of James R.*, 2018 ME 50, ¶ 21, 182 A.3d 1252 (stating that "the Department is required to make reasonable efforts to rehabilitate and reunify the family of a child removed from the home" (quotation marks omitted)). Although at oral argument the mother raised this distinction between the two standards, she did not raise the issue in her brief—and in fact in her brief she cited the reasonableness standard set forth in *Annette P.* as the correct standard—and therefore did not preserve the issue for our review. *See Bayside Enters., Inc. v. Me. Agric. Bargaining Bd.*, 513 A.2d 1355, 1361 (Me. 1986) (holding that an issue raised for the first time at oral argument is not preserved for review). Even if the issue had been preserved, her argument would be unavailing because the court's findings in this case regarding active efforts satisfy the standard set out in the BIA's Final Rule and non-binding guidance.

include, at a minimum, offering services to the mother designed to improve her ability to recognize the threat posed by Father and be able to demonstrate her ability to protect the child from that threat. The court finds that the Department has done that. Although it offered services with more local therapists, the Mother wanted to see counselors in Bangor. The Department at times provided transportation for that to occur. Moreover, the Department provided Family Team Meetings in order to gauge the direction of the case and address issues. Despite the services offered, the Department's efforts were not successful. . . .

With respect to Father, the Department did assist in having a counselor at the jail see the Father and also took efforts with the county jail to enable Father to participate in team meetings. It also arranged for a CODE early on, which the Father did not initially attend. . . . Admittedly, Father's incarceration made it difficult for services to be offered and for him to participate. However, . . . pedophilia lacks an effective treatment, and according to the Qualified Expert Witness, the Department is not obligated to engage in efforts, reasonable[,] active[,] or otherwise, that may prove fruitless. Based on the evidence and based on the [Nation's] Qualified Expert Witness's opinion, the court finds, by clear and convincing evidence, that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.

In addition to engaging in "active efforts[,"] the Department has established and the court finds by proof beyond a reasonable doubt that . . . continued custody of the child by either parent is likely to result in serious emotional or physical damage to the child. . . . Absent a demonstrated understanding of the significant risk Father poses both by his prior conduct and by that which the child has recently disclosed, the child remains at significant risk and is likely to suffer serious emotional or physical damage, victimization and injury, all of which is supported by the opinion of the Qualified Expert Witness.

(Footnotes omitted.)

[¶14]  The mother and father filed timely notices of appeal.  *See* 22 M.R.S. § 4006; M.R. App. P. 2B(c)(1).  The mother then filed a motion in the District Court for relief from judgment on the ground of ineffective assistance of counsel.  *See* M.R. Civ. P. 60(b)(6); *In re M.P.*, 2015 ME 138, ¶¶ 20-21, 126 A.3d 718.  At the same time, the Department and the mother filed a joint motion to stay the appeal and permit the trial court to act on the mother's Rule 60(b) motion.  *See* M.R. App. P. 3(d).

[¶15]  The father then filed his own motion for relief from judgment in the District Court on the ground of ineffective assistance of counsel, accompanied by his supporting affidavit, *see* M.R. Civ. P. 60(b)(6); *In re M.P.*, 2015 ME 138, ¶¶ 20-21, 126 A.3d 718, and a motion to enlarge the time to file additional affidavits in support of that motion.  The father also filed a motion with us to stay the appeal and permit the trial court to act on his Rule 60(b) motion.  *See* M.R. App. P. 3(d).  We granted each parent's motion to stay the appeal and permitted the trial court to act on the parents' Rule 60(b) motions.  Following the issuance of our order, the father filed his second motion in the District Court to transfer the case to the Penobscot Nation Tribal Court.  *See* 25 U.S.C.S. § 1911(b); 25 C.F.R. § 23.115.

[¶16]  Based on the existing record and the court's extensive familiarity with this case, and without taking additional evidence, *see In re David H.*, 2009 ME 131, ¶ 34, 985 A.2d 490, the court issued two orders.  In one order, the court addressed the father's motion to transfer the case to Tribal Court and concluded that it was without authority to act on the motion because the father had failed to seek leave from us to take such action.  *See* M.R. App. P. 3(d).  The court's second order denied the parents' Rule 60(b) motions after determining that the father's claim of ineffectiveness at the jeopardy hearing was untimely and rejecting on the merits each parent's claim of ineffectiveness.  *See In re M.P.*, 2015 ME 138, ¶¶ 26-27, 126 A.3d 718.

[¶17]  After the court entered judgment on all of the matters properly before it, the appeal moved forward, taking us to the issuance of this opinion.

## II.  DISCUSSION

[¶18]  This appeal presents a broad range of issues for our consideration: the substantive state and federal standards governing the termination of parental rights to an Indian child; temporal considerations for motions to transfer a child protection action from state court to a tribal court; temporal and substantive standards for claims of ineffective assistance of counsel at the

jeopardy and termination stages of a child protection case; and appellate practice.

A.    Judgment Terminating the Parents' Parental Rights

[¶19]  State court child protection proceedings involving Indian children, such as the child at issue here, *see supra* n.1, require the court to apply both state child protection law prescribed by Maine's Child and Family Services and Child Protection Act, and federal law prescribed by the Indian Child Welfare Act of 1978.  Because of the differences in state and federal law, we briefly review the pertinent parts of each before addressing the merits of the parents' contentions.

1.    Applicable Provisions of the MCPA and ICWA

[¶20]  "Recognizing that . . . the right to family integrity is limited by the right of children to be protected from abuse and neglect,"  22 M.R.S. § 4003, the Legislature enacted the MCPA to provide legal processes that

> [remove children] from the custody of their parents only where failure to do so would jeopardize their health or welfare; . . . [g]ive family rehabilitation and reunification priority as a means for protecting the welfare of children, but prevent needless delay for permanent plans for children when rehabilitation and reunification is not possible; . . . [and p]romote the early establishment of permanent plans for the care and custody of children who cannot be returned to their family,

14

*id.* § 4003(2)-(4).[8]  Because the relationship between a parent and a child is constitutionally protected, *see Troxel v. Granville*, 530 U.S. 57, 65-66 (2000), when the Department files a petition to terminate parental rights, the Due Process Clause of the United States Constitution and Maine law require that the Department prove each of the two elements of a termination case—parental unfitness as statutorily defined,[9] and the child's best interest—by clear and convincing evidence, *see* 22 M.R.S. § 4055(1)(B)(2); *Santosky v. Kramer*, 455 U.S. 745, 769-70 (1982).

[¶21]  When a child protection action involves an Indian child, the Department is also obligated to meet the federal requirements found in ICWA. Through ICWA, Congress recognized "that there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children,"

---

[8]  Title 22 M.R.S. § 4003(3) (2018) has since been amended.  P.L. 2017, ch. 470, § 1 (effective December 13, 2018) (codified at 22 M.R.S. § 4003(3)).

[9]  As provided in 22 M.R.S. § 4055(1)(B)(2)(b) (2018), the four statutory forms of parental unfitness are as follows:

(i) The parent is unwilling or unable to protect the child from jeopardy and these circumstances are unlikely to change within a time which is reasonably calculated to meet the child's needs;

(ii) The parent has been unwilling or unable to take responsibility for the child within a time which is reasonably calculated to meet the child's needs;

(iii) The child has been abandoned; or

(iv) The parent has failed to make a good faith effort to rehabilitate and reunify with the child pursuant to section 4041.

25 U.S.C.S. § 1901(3), and established "minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes [that] will reflect the unique values of Indian culture," *id.* § 1902; *see also In re Trevor I.*, 2009 ME 59, ¶ 15, 973 A.2d 752.

[¶22] ICWA imposes two elements of proof in a state court termination proceeding beyond those required by state law. First, ICWA requires "[a]ny party seeking to effect a . . . termination of parental rights to . . . an Indian child under State law [to] satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." 25 U.S.C.S. § 1912(d). Although ICWA does not identify the standard of proof applicable to this element, we have held that those active efforts must be established by clear and convincing evidence. *See In re Annette P.*, 589 A.2d 924, 928 (Me. 1991). Second, ICWA requires that the petitioning party show "beyond a reasonable doubt . . . that the continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child." 25 U.S.C.S. § 1912(f).

[¶23]  Therefore, pursuant to the combined effect of the state and federal statutes, when the child to be protected is an Indian child, the Department must prove three elements by clear and convincing evidence: (1) the parent of the child is parentally unfit; (2) termination of parental rights is in the child's best interest; and (3) active efforts have been made to prevent the breakup of the child's Indian family and those efforts have been unsuccessful.  Additionally, the Department must prove beyond a reasonable doubt that the child is likely to suffer serious emotional or physical damage if the child were to remain in the parent's custody.

2.     The Parents' Contentions

[¶24]   With that background, we first address the parents' common assertion that the court erred by finding that active efforts had been made to prevent the breakup of the Indian family, as required by ICWA.  *See* 25 U.S.C.S. § 1912(d).  We then address the mother's assertion that the court erred by finding that she was parentally unfit within the meaning of state law.  *See* 22 M.R.S. § 4055(1)(B)(2)(b).

a.     The Parents' Shared Contention: Active Efforts

[¶25]   The parents do not challenge the court's conclusions that termination of their parental rights is in the best interest of the child and that

the child would likely suffer serious emotional or physical damage if she were to remain in their custody, and the father does not challenge the court's conclusion that he is parentally unfit. Instead, each parent contends that the court erred by finding that active efforts had been made to prevent the breakup of the Indian family and that those efforts had proved unsuccessful. "Like the determination of the other elements under [22 M.R.S. § 4055(1)], we will affirm the court's findings [of active efforts] if supported by clear and convincing evidence in the record." *In re Annette P.*, 589 A.2d at 928.

[¶26] Although the nature of "active efforts" is not defined in ICWA itself, it is defined in a rule promulgated in 2016 (the Final Rule) by the federal Bureau of Indian Affairs.[10] *See* 25 C.F.R. § 23.2 (2018). The Final Rule specifies that "active efforts" comprise "affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child with his or her family." *Id.* Where an agency—such as the Department—is involved, "active efforts must involve assisting the parent or parents . . . through the steps of a case plan and with accessing or developing the resources necessary to satisfy the case plan." *Id.* Moreover, "[t]o the maximum extent possible," active efforts should be made consistent with "the prevailing social and culture conditions

---

[10] The Final Rule applies in this case because it was promulgated in December of 2016, three months before the termination petition was filed. *See* 25 C.F.R. § 23.143 (2018).

and way of life of the Indian child's Tribe and should be conducted in partnership" with the child, the parents, the extended family members, and the tribe. *Id.* "Active efforts are to be tailored to the facts and circumstances of the case," and may include the following:

> (1) Conducting a comprehensive assessment of the circumstances of the Indian child's family, with a focus on safe reunification as the most desirable goal;
>
> (2) Identifying appropriate services and helping the parents to overcome barriers, including actively assisting the parents in obtaining such services;
>
> (3) Identifying, notifying, and inviting representatives of the Indian child's Tribe to participate in providing support and services to the Indian child's family and in family team meetings, permanency planning, and resolution of placement issues;
>
> (4) Conducting or causing to be conducted a diligent search for the Indian child's extended family members, and contacting and consulting with extended family members to provide family structure and support for the Indian child and the Indian child's parents;
>
> (5) Offering and employing all available and culturally appropriate family preservation strategies and facilitating the use of remedial and rehabilitative services provided by the child's Tribe;
>
> . . . .
>
> (7) Supporting regular visits with parents . . . in the most natural setting possible as well as trial home visits of the Indian child during any period of removal, consistent with the need to ensure the health, safety, and welfare of the child;

(8) Identifying community resources including housing, financial, transportation, mental health, substance abuse, and peer support services and actively assisting the Indian child's parents or, when appropriate, the child's family, in utilizing and accessing those resources;

(9) Monitoring progress and participation in services.

*Id.*

[¶27]  In this case, competent record evidence supports the court's findings that active efforts were made to prevent the breakup of this Indian family and that those efforts were unsuccessful.  *See* 25 U.S.C.S. § 1912(d); 25 C.F.R. § 23.2.  As the court found, the Department had provided significant case management services to the family, including scheduling family team meetings to address parenting issues and gauge any progress toward reunification; referring the mother to services intended to "improve her ability to recognize the threat posed by [the] Father and . . . protect the child from that threat," including the non-offenders group and multiple counselors; helping to provide the mother with transportation to attend the services provided to her; assisting the father in securing a counselor willing to provide services at the jail facility; and arranging for each parent to participate in a CODE.[11]

---

[11]  Though not included as a finding in the termination judgment, the court was presented with evidence that, after being placed in the Department's custody, the child was also provided with counseling and participated in a CODE evaluation.

[¶28]  As the court found, the active efforts directed toward the mother were not successful—an outcome that was largely attributable to her unwillingness to participate in the services that were offered.  The Department presented the court with evidence that its caseworkers had difficulty contacting the mother and that multiple counselors had discharged the mother as a client because of her inconsistent attendance.  Moreover, in spite of the efforts made to improve the mother's understanding of the danger the father poses to their child, the mother chose to maintain a relationship with the father by regularly contacting him—including in person—while he was incarcerated.

[¶29]  With regard to the father, the court made the supported finding that because he was incarcerated throughout the pendency of this case on charges of sexually assaulting a child, it was difficult for the Department to provide him with services.  The court also found that the father is a diagnosed pedophile, a pathology that lacks effective treatment, particularly for incarcerated persons.  Given the high risk of harm the father poses to the child, the court did not err by concluding that the Department's actions—including facilitating his attendance at family team meetings, assisting him with access to a counselor, and making two CODE referrals—rose to the level of active efforts

"tailored to the facts and circumstances of the case," 25 C.F.R. § 23.2, and that those efforts were unsuccessful, *see* 25 U.S.C.S. § 1912(d).

[¶30] Competent record evidence also supports the court's finding that "the Department included the Penobscot Nation in the process of managing this case." The Department gave the Nation advance notice of its plan to file the child protection petition, and, through its caseworker, the Nation was an active participant—including as a decision-maker—throughout the pendency of the proceedings. The Nation's caseworker attended family team meetings, communicated directly with the child's foster parents, and made a home visit. Moreover, the Nation's caseworker helped to fashion a cultural contract between the Penobscot Nation and the child's foster parents—whom the Nation considers to be the child's extended family members, *see supra* n.4—to ensure that the child's life will continue to be enriched by tribal culture, thereby manifesting a demonstrable active effort to maintain and nurture the connection between the Nation and the child.[12]

---

[12] Additionally, in accordance with the provisions of the Interstate Compact for the Placement of Children, 22 M.R.S. §§ 4251-4269 (2018), the Department arranged for ICPC studies of the homes of the child's maternal grandmother and grandfather, *see id.* § 4255, who live separately in California, as possible kinship placements for the child. At the time of the hearings on the termination petition, neither home was approved as a placement for the child.

[¶31]   Importantly, the court properly relied on the opinion of the Nation's designated qualified expert witness, *cf.* 25 U.S.C.S. § 1912(e); 25 C.F.R. § 23.122, who testified that, in her opinion, the Department had engaged in active efforts as ICWA requires, and, although the Department bears the burden of proving active efforts, that the parents are responsible for engaging in those efforts.  The court's supported findings establish that the parents failed to fulfill that responsibility.

[¶32]  For these reasons, the court was fully warranted in concluding that the Department had satisfied its burden to show clearly and convincingly that active efforts had been made to prevent the fracture of this Indian family but that the efforts were unsuccessful.

b.      The Mother's Additional Contention: Parental Unfitness

[¶33]   Beyond this, the mother contends that the court also erred by determining that she is parentally unfit because she was unable or unwilling to protect the child from jeopardy or take responsibility for the child within a time period reasonably calculated to meet the child's needs.  *See* 22 M.R.S. § 4055(1)(B)(2)(b)(i)-(ii).  She asserts that evidence in the record shows that she now understands the risks that the father poses to the child, that she has learned how to identify signs of sexual abuse and sexual abusers, and that she

has "improved since starting therapy." We review the court's findings of fact for clear error. *See In re Child of Kimberlee C.*, 2018 ME 134, ¶ 5, 194 A.3d 925.

[¶34] The mother's assertion is undermined by the court's supported assessment that her words were belied by her actions throughout this child protection proceeding. The court found in its earlier jeopardy order—and the mother agreed—that she had failed to protect the child from the threat of sexual abuse or exploitation posed by the father. At the termination hearing, the court was presented with evidence of the mother's close and ongoing relationship with the father despite his incarceration and the risks she knows he presents to the child, including evidence that she even invited him to participate in her own therapeutic counseling sessions. The court rejected the credibility of the mother's testimony—as it was entitled to do—that sought to minimize her contact with the father and demonstrate a shift in her appreciation of the danger he poses to the child. Moreover, the mother's failure to engage meaningfully with the Department or the services provided to her is further proof of her inability to protect or take responsibility for the child within a time reasonably calculated to meet the child's needs. *See In re Child of Ronald W.*, 2018 ME 107, ¶ 11, 190 A.3d 1029; *In re Charles G.*, 2001 ME 3, ¶ 7, 763 A.2d 1163.

[¶35] The court did not err by finding the mother to be parentally unfit on those two statutory grounds.

B. The Father's Motions to Transfer to Tribal Court

[¶36] The father asserts that the court erred by denying both of his motions to transfer this proceeding to the Penobscot Nation Tribal Court. *See* 25 U.S.C.S. § 1911(b). He filed the first of these motions shortly before the termination hearing was scheduled to begin, and he filed the second after we stayed this appeal to allow the court to adjudicate the parents' Rule 60(b) motions alleging ineffective assistance of counsel. Because of the differing procedural contexts in which the father filed the motions to transfer, we address them separately.

1. Pre-Judgment Motion to Transfer to Tribal Court

[¶37] The father challenges the court's denial of his first motion to transfer the case to the Tribal Court, *see* 25 U.S.C.S. § 1911(b), which he filed within a week before the termination hearing was scheduled to begin. In denying the motion, the court concluded that there was good cause to allow the matter to continue in state court because the motion was filed at an advanced stage of the case. *See id.* The father asserts that the court erred because ICWA precludes a court from treating an advanced-stage filing of such a motion as a

proper basis to deny it.  We construe the provisions of section 1911(b) de novo.

*See In re Children of Shirley T.*, 2019 ME 1, ¶ 16, 199 A.3d 221.

> [¶38]  Section 1911(b) specifies that
>
> [i]n any State court proceeding for the . . . termination of parental rights to . . . an Indian child not domiciled or residing within the reservation of the Indian child's tribe, the court, *in the absence of good cause to the contrary*, shall transfer such proceeding to the jurisdiction of the tribe, absent objection by either parent, upon the petition of either parent . . . or the Indian child's tribe: *Provided*, that such transfer shall be subject to declination by the tribal court of such tribe.

25 U.S.C.S. § 1911(b) (first emphasis added).  Thus, when a petition to transfer a case to a tribal court is filed by either a parent or the child's tribe, "[t]he tribal court's jurisdiction is 'presumptive[]' unless a parent objects, the tribe declines jurisdiction, or good cause to maintain the matter in the state court is established."[13]  *In re Children of Shirley T.*, 2019 ME 1, ¶ 14, 199 A.3d 221

---

[13]  Pursuant to both the Final Rule, 25 C.F.R. § 23.116 (2018), and general notions of case management, the best practice is for the state court, at the earliest practicable time, to contact the tribal court and inquire whether the tribal court would be inclined to accept or decline the transfer, to the extent that the tribal court is in a position to assess the situation in that preliminary setting. Here, this provision of the Final Rule was not brought to the attention of the trial court by any party in this case, and given the temporal circumstances discussed in the text, any procedural shortcoming is not material to our treatment of this issue on appeal.

The Final Rule also provides that a party objecting to a transfer motion must present the objection and its basis on the record, either orally or in writing, and the court must then provide all parties with an opportunity to be heard on the matter. 25 C.F.R. § 23.118(a)-(b) (2018). These requirements were satisfied here.

(quoting *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 36 (1989)) (second alteration in original); *see also* 25 C.F.R. § 23.117 (2018).

[¶39]  As with the meaning of "active efforts" discussed *supra* ¶¶ 21-32, "good cause" is neither defined nor further explicated in ICWA itself but is addressed in the Final Rule.  *See* 25 C.F.R. § 23.118 (2018).  The Final Rule, however, does not go so far as to define or provide examples of what *is* good cause.  Rather, the Final Rule identifies certain factors that a court may *not* consider in its calculus of whether there is good cause to deny a transfer of the case to a tribal court.  The prohibited consideration relevant here is "[w]hether the . . . termination-of-parental-rights proceeding is at an advanced stage if the Indian child's parent . . . or Tribe did not receive notice of the child-custody proceeding until an advanced stage."[14]  *Id.* § 23.118(c)(1).  BIA guidelines published in 2016 further clarify the relevant provisions in ICWA and the Final Rule by stating that "Congress intended for the transfer requirement and its

---

[14]  The other factors, none of which is germane here, are

> (2) Whether there have been prior proceedings involving the child for which no petition to transfer was filed;
> (3) Whether transfer could affect the placement of the child;
> (4) The Indian child's cultural connections with the Tribe or its reservation; or
> (5) Socioeconomic conditions or any negative perception of Tribal or BIA social services or judicial systems.

25 C.F.R. § 23.118(c)(2)-(5) (2018).

exceptions to permit State courts to exercise case-by-case discretion regarding the 'good cause' finding," similar to "a modified (*i.e.* limited, narrow) version of the *forum non conveniens* analysis." Indian Child Welfare Act Proceedings, 81 Fed. Reg. 38,778, 38,821, 38,825 (June 14, 2016) (to be codified at 25 C.F.R. pt. 23); *see also In re Children of Shirley T.*, 2019 ME 1, ¶ 24, 199 A.3d 221.

[¶40] Although "[t]here is no dispute that the burden to prove good cause falls on the party opposing tribal jurisdiction," *Thompson v. Fairfax Cty. Dep't of Family Servs.*, 747 S.E.2d 838, 848 (Va. Ct. App. 2013); *see also People ex rel. T.I.*, 707 N.W.2d 826, 834 (S.D. 2005), neither ICWA nor the Final Rule identifies the evidentiary standard applicable to the good-cause analysis. Several courts have determined that the applicable standard of proof is clear and convincing evidence. *See, e.g.*, *State v. Reich-Crabtree (In re M.H.C.)*, 381 P.3d 710, 715 (Okla. 2016); *People ex rel. J.L.P.*, 870 P.2d 1252, 1257 (Colo. App. 1994); *In re M.E.M.*, 635 P.2d 1313, 1317 (Mont. 1981); *see also* Indian Child Welfare Act Proceedings, 81 Fed. Reg. at 38,827. This is the standard of proof that the court applied here. Because this high standard operates to the father's benefit, we assume, without the need to decide, that this is the proper quantum of evidence that must be met to defeat a motion to transfer.

[¶41] The father contends that the court erred by finding that his motion was "untimely and made at [an] advanced stage and [that the] father didn't act promptly" because, the father asserts, the provision of the Final Rule quoted above prohibits the court from considering the advanced stage of the proceedings in its good-cause analysis. This prohibition, however, does not apply here because, pursuant to the plain language of the Final Rule, the court is foreclosed from considering an advanced stage of the proceeding when making a good-cause determination only "if the Indian child's parent . . . or Tribe *did not receive notice of the child-custody proceeding until an advanced stage.*" 25 C.F.R. § 23.118(c)(1) (emphasis added). In this way, the prohibition is meant to "ensure[] that parents . . . and Tribes who were disadvantaged by noncompliance with ICWA's notice provisions may still have a meaningful opportunity to seek transfer." Indian Child Welfare Act Proceedings, 81 Fed. Reg. at 38,825.

[¶42] Here, there was no deficiency in the notice of this action—and the applicability of ICWA to it—provided both to the father and to the Penobscot Nation. In fact, the father testified during the hearing on his motion to transfer that "[v]ery early on" he had asked his first attorney "to give [him] information on ICWA and tribal aspects of this case" and that his request to transfer the case

to the Tribal Court was "something [he had] been thinking about since this case first started." The Nation received notice of the impending child protection case even before the Department filed the child protection petition in February of 2016 and was granted intervenor status the following month—and in that capacity explicitly opposed the father's motion to transfer the case to its Tribal Court. Because there was no failure or deficiency in notice of this child protection action, the court did not err as a matter of law when it considered the advanced stage of the proceedings in its good-cause inquiry.

[¶43] The father further contends that even if the court was permitted to consider the advanced stage of the proceedings, the term "advanced stage" refers to each stage of a child protection case, not the case as a whole, and that because his motion was filed before the termination hearing began, the motion was not filed at an advanced stage of that proceeding.

[¶44] For purposes of the advanced-stage analysis, the sequential procedural phases of a child protection case are considered separately. *See* Indian Child Welfare Act Proceedings, 81 Fed. Reg. at 38,825 ("Each individual proceeding will culminate in an order, so 'advanced stage' is a measurement of the stage within each proceeding."). Therefore, we must look only to the

termination phase of this case to assess whether the court erred by concluding that the father filed the motion unduly late.

[¶45]  Although the termination *hearing* had not begun when the father filed the motion, the termination *proceeding* in this case began in March of 2017—almost eight months before the father filed the motion—when the Department filed the termination petition.  The hearing on that petition was then continued multiple times for legitimate reasons—including once at the father's own request so that his fourth, most recently appointed attorney would have adequate time to prepare.

[¶46]  Given those temporal circumstances, including the last-minute filing of the motion to transfer, and the father's demonstrated proficiency at filing motions without the assistance of counsel, the court did not err by concluding that there was good cause to deny the father's pre-judgment motion to transfer.

2.     Post-Judgment Motion to Transfer to Tribal Court

[¶47]  The father next asserts that the court erred by declining to consider his post-judgment motion to transfer this case—meaning the proceeding to address his Rule 60(b) motion alleging ineffectiveness of counsel—to the Penobscot Nation Tribal Court for adjudication there.  The

father filed that motion in the District Court *after* we had stayed the appeal to allow the District Court to act on his pending Rule 60(b) motion. The court denied the motion to transfer after concluding that it did not have authority to act that motion because of the effect of Maine Rule of Appellate Procedure 3(c). The court was correct.

[¶48] After an appeal is filed, "[t]he trial court shall take no further action pending disposition of the appeal," *Doggett v. Town of Gouldsboro*, 2002 ME 175, ¶ 5, 812 A.2d 256 (quotation marks omitted), unless either the trial court's action is explicitly permitted by Maine Rule of Appellate Procedure 3(c), or, on a motion that states the reason for the request, we authorize the trial court to act, *see* M.R. App. P. 3(d).

[¶49] Rule 3(c) did not authorize the trial court to adjudicate the father's post-judgment motion to transfer because the motion is not among the small number of enumerated matters on which the trial court may take action while an appeal is pending without our leave. Beyond that, with respect to Rule 3(d), the father's motion for us to stay the appeal so as to allow the trial court to act on post-trial matters did not encompass the motion to transfer. Rather, his motion sought to allow the District Court to act only on "his May 31, 2018, motions," which comprised only his Rule 60(b) motion alleging ineffective

32

assistance of counsel and a related motion for an enlargement of time to file affidavits in support of that motion. Because the court was not authorized to act on the father's post-judgment motion to transfer, the trial court correctly declined to consider it.

C.     The Father's Rule 60(b) Motion for Relief from Judgment Alleging Ineffective Assistance of Counsel

[¶50] The father finally argues that the court erred by denying his motion for relief from judgment based on an allegation of ineffective assistance of counsel.[15] He claims that he was not represented effectively by his first attorney at the jeopardy hearing, and he also claims that his next three lawyers, who represented him sequentially through the time the court issued the termination judgment, were ineffective because none of them filed a timely motion to transfer the case to the Tribal Court. The father filed his notice of appeal, however, before the court denied his Rule 60(b) motion and did not file a separate notice of appeal from that order. This raises the question of whether the father's challenge to this post-judgment order is properly before us. We address this issue first.

---

[15]     Although the court also denied the mother's Rule 60(b) motion alleging ineffective representation, she does not challenge that determination on appeal.

1. Appealing a Decision on a Rule 60(b) Motion for Relief from Judgment

[¶51] As the governing rule applies here, to appeal a civil judgment, the party must file a notice of appeal within "21 days after entry into the docket of the judgment or order appealed from." M.R. App. P. 2B(c)(1)-(2), (d). The notice of appeal "shall specify the party taking the appeal [and] designate the judgment or part thereof appealed from." M.R. App. P. 2A(b)(1).

[¶52] Maine Rule of Appellate Procedure 2B(c)(2) provides that a timely notice of appeal is deemed to encompass challenges to certain enumerated post-judgment orders issued *after* the notice of appeal is filed, without the need for the party to file a separate notice of appeal from that order. The list of motions that qualify for this treatment is explicitly exhaustive, as the Rule states that it "does not apply to any post-judgment motion that is not listed" therein. *Id.*

[¶53] The effect of this is to place all parties on notice of what the appellant must do to be able to challenge a particular judicial action on appeal, and to ensure that the appellee receives the opportunity to adequately represent its interests on that appeal, such as verifying that the appendix contains the documents that bear on the appellate issues, *see* M.R. App. P. 8(i). *See Estate of MacComb*, 2015 ME 126, ¶ 10, 124 A.3d 1119 ("A failure to comply

with the Maine Rules of Appellate Procedure . . . compromises both the appellee's ability to defend against the appeal and our ability to decide it.").

[¶54] A motion for relief from judgment pursuant to M.R. Civ. P. 60(b)—such as the motion at issue here—is not among the motions enumerated in Rule 2B(c)(2). Consequently, the father's notice of appeal from the underlying termination judgment was not sufficient to preserve a challenge to the subsequent denial of his Rule 60(b)(6) motion. Rather, to present that challenge for appellate review, he was required to file a separate notice of appeal of that post-judgment order. Having not done so, the father's assertion that the court erred by denying his Rule 60(b) motion is not cognizable on this appeal. *See Rice v. Amerling*, 433 A.2d 388, 391 (Me. 1981) (stating that "[a]ll statutory requirements for perfecting an appeal are jurisdictional and require strict compliance"); *cf. In re Melissa T.*, 2002 ME 31, ¶ 5, 791 A.2d 98 (stating that because the mother filed a brief but did not file any notice of appeal as required by the Maine Rules of Appellate Procedure "we lack jurisdiction to review her claim").

[¶55] Even if the father had preserved for appellate review his challenge to the court's denial of his motion, his contention would be unavailing. The father's claim of ineffectiveness extended to all four of the attorneys who

represented him in the trial court and encompassed the jeopardy and termination phases of this case. In its order, the court concluded that the motion as it related to the jeopardy hearing was untimely, and that, on the merits, the father had not established ineffective assistance of counsel subsequent to the jeopardy hearing, including during the termination proceedings. The court committed no error by denying both aspects of the motion. As to the claim of ineffectiveness by the three attorneys who represented him seriatim after the jeopardy hearing, we are satisfied the evidence did not compel the court to make the findings necessary for it to grant his motion. *See In re Alexandria C.*, 2016 ME 182, ¶¶ 18-20, 152 A.3d 617 (stating the elements of a claim of ineffectiveness and the standard of review for an appellate challenge of the denial of a motion asserting such a claim). As to the father's claim that the court erred by denying his motion as untimely to the extent the motion related to the jeopardy stage of this case, we take this opportunity to clarify the applicable law.

2. Raising a Claim of Ineffective Representation Provided at the Jeopardy Stage of a Child Protection Action

[¶56] As a threshold matter, we must conclude that a parent's right to counsel during the jeopardy stage of child protection proceeding includes the right to the *effective* assistance of counsel. Maine law provides that, subject to

two limited exceptions not relevant to this appeal, parents are entitled to be represented by legal counsel in all child protection proceedings, which includes the jeopardy phase of the case.  22 M.R.S. § 4005(2).  Implicit in this right to legal counsel is the right to representation that is competent and effective.  *See Petgrave v. State*, 2019 ME 72, ¶ 6, ---A.3d--- (concluding that the statutory right to counsel at a probation revocation hearing encompasses the right to effective representation); *In re Henry B.*, 2017 ME 72, ¶ 6, 159 A.3d 824 (same with respect to the statutory right to counsel during an involuntary commitment proceeding).  This is particularly true in a child protection action, which implicates a parent's constitutional right to parent his or her child.  *See Troxel*, 530 U.S. at 65-66; *see also Pitts v. Moore*, 2014 ME 59, ¶ 11, 90 A.3d 1169.

[¶57]  The issue generated here is of a narrower, temporal nature: for how long after the entry of a jeopardy order may a parent bring a timely claim of ineffective assistance of counsel in a motion for relief from judgment pursuant to Rule 60(b)(6)?

[¶58]  In *In re M.P.*, 2015 ME 138, ¶¶ 18-21, 126 A.3d 718, we established procedures for parents to bring claims of ineffective assistance of counsel in a termination proceeding.  Among other things, we stated that a claim of ineffective assistance of counsel may be raised in a direct appeal if the record

already contains the basis for the claim, but otherwise the claim must be presented in a Rule 60(b)(6) motion for relief from a judgment that is filed within 21 days after the expiration of the time to appeal the underlying judgment. *Id.* ¶¶ 19-20. We have made clear that the importance of protecting "parents' fundamental right to effective assistance of counsel" must be balanced against the "simultaneous interest of the State in promoting 'the early establishment of permanent plans' for the children." *In re Evelyn A.*, 2017 ME 182, ¶ 19, 169 A.3d 914 (quoting 22 M.R.S. § 4003(4)); *see also In re M.P.*, 2015 ME 138, ¶ 21, 126 A.3d 718 ("Because of the counter-balancing interests of the State in ensuring stability and prompt finality for the child, if the parent fails to comply with this procedure, the parent's motion asserting the ineffective assistance of counsel must be denied.").

[¶59]  The need for a "swift resolution of ineffectiveness claims" at the termination stage of child protection proceedings, *In re M.P.*, 2015 ME 138, ¶ 19, 126 A.3d 718, applies just as forcefully at the jeopardy stage because of the nature of the parents' interests that are affected by a jeopardy order and the ongoing importance of achieving ultimate permanency for the child.  If, for example, a parent were allowed to wait until after the entry of a termination judgment before reaching back and challenging the process affecting a much

earlier phase in the case, there would be the prospect that much of the case could be unwound, resulting in unnecessary and damaging delays in the case's resolution. Therefore, we now announce that the procedural requirements governing a motion for relief from judgment based on a claim of ineffective assistance of counsel in a jeopardy proceeding—including the deadlines for filing such a motion relative to the date a jeopardy order is entered—are the same as those we prescribed for a claim of ineffectiveness at a termination hearing, *see id.* ¶¶ 20-21.[16]

[¶60] This extension of the post-termination framework governing claims of ineffective assistance of counsel to jeopardy hearings was not in place at the time the jeopardy order was issued against the father, and we therefore do not hold the father rigidly to the temporal requirements of that process. Nonetheless, the court did not err by denying the father's Rule 60(b) motion for relief from the jeopardy order as untimely because, even if the father is allowed to benefit from a more generous view of when such a claim must be raised, the father filed the motion beyond any reasonable temporal parameter—nearly *two years* after the jeopardy order was entered. *See In re Evelyn A.*, 2017 ME

---

[16] A parent has the statutory right to appeal from a jeopardy order, *see* 22 M.R.S. §§ 4006, 4035 (2018), and therefore has access to the same procedural vehicle for asserting a claim of ineffectiveness as with a judgment terminating parental rights.

182, ¶¶ 7, 12, 19, 169 A.3d 914 (concluding that the parents' challenge to the effectiveness of counsel at a jeopardy proceeding "came far too late" where the challenge was brought more than two years after the entry of the jeopardy order and many months after the termination judgment was entered); M.R. Civ. P. 60(b) (requiring that a motion for relief from judgment be made "within a reasonable time"); *see also* 22 M.R.S. § 4003(3) (stating the Legislature's intent to "prevent needless delay for permanent plans for children").  During that nearly two-year period that began in June of 2016, the attorney who represented the father at the jeopardy hearing was given leave to withdraw in September of 2016, and the father then came to be represented by three more attorneys in series, eliminating any concern that the father would have had to assert a claim of ineffectiveness against his current attorney.  These circumstances allowed ample time and opportunity for the father to have asserted, pursued, and be heard on a claim of ineffective representation at the jeopardy hearing.

[¶61]  Therefore, the court acted well within its authority when it denied as untimely the father's Rule 60(b) motion as it related to counsel's representation of him at the jeopardy hearing.

## III. CONCLUSION

[¶62]  This action presented the court with considerable challenges both in case management and on the merits, including the application of complex laws governing substance and process, the consideration and analysis of a large body of evidence, and the participation of parents who did not work well with their numerous legal counsel.  Despite these challenges, the court's management of this case was exemplary, and the court committed no error by terminating the parents' parental rights and denying their other requests for relief.

The entry is:

Judgment affirmed.

---

Randy G. Day, Esq., Garland, and Amy R. McNally, Esq. (orally), Woodman Edmands Danylik Austin Smith & Jacques, P.A., Biddeford, for appellant mother

Laura P. Shaw, Esq. (orally), Camden Law LLP, Camden, for appellant father

Janet T. Mills, Attorney General, and Meghan Szylvian, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, for appellee Department of Health and Human Services

Carolyn Adams, Esq., Law Office of Carolyn Adams, Waterville, for appellee Penobscot Nation Department of Social Services.

Calais District Court docket number PC-2016-01
FOR CLERK REFERENCE ONLY