IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2019 Term

_____

Nos. 18-0842, 18-0849, 18-0850, and 18-0854

_____

**FILED**

**November 7, 2019**

**released at 3:00 p.m.**
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

IN RE: N.R., A.R., AND A.W.

_____

Appeals from the Circuit Court of Ohio County
Honorable James P. Mazzone, Judge
Civil Action Nos. 13-CJA-33/34/35 and 14-CJA-76/77/78

AFFIRMED, IN PART, REVERSED, IN PART,
AND REMANDED WITH DIRECTIONS

_____

Submitted: October 1, 2019
Filed: November 7, 2019

Joseph J. Moses, Esq.
Guardian Ad Litem
Wheeling, West Virginia


Patrick Morrisey, Esq.
Attorney General
Lindsay S. See, Esq.
Solicitor General
Charleston, West Virginia
Lee Niezgoda, Esq.
Assistant Attorney General
Chaelyn W. Casteel, Esq.
Assistant Attorney General
Fairmont, West Virginia
Attorneys for West Virginia DHHR

David C. Fuellhart, III, Esq.
Isner Law Office
Elkins, West Virginia
Attorney for Father, A.R.


Jeremy B. Cooper, Esq.
Blackwater Law PLLC
Kingwood, West Virginia
Attorney for Mother, A.R.

JUSTICE HUTCHISON delivered the Opinion of the Court.

# SYLLABUS BY THE COURT

1. "'Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety.' Syl. Pt. 1, *In re Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996)." Syl. Pt. 1, *In re Cecil T.*, 228 W.Va. 89, 717 S.E.2d 873 (2011).

2. "Although parents have substantial rights that must be protected, the primary goal in cases involving abuse and neglect, as in all family law matters, must be the health and welfare of the children." Syl. Pt. 3, *In re Katie S.*, 198 W.Va. 79, 479 S.E.2d 589 (1996).

3. ""In a contest involving the custody of an infant the welfare of the child is the polar star by which the discretion of the court will be guided." Syl. pt. 1, *State*

*ex rel. Cash v. Lively*, 155 W.Va. 801, 187 S.E.2d 601 (1972).' Syllabus Point 4, *State ex rel. David Allen B. v. Sommerville*, 194 W.Va. 86, 459 S.E.2d 363 (1995)." Syl. Pt. 2, *In re Kaitlyn P.*, 225 W.Va. 123, 690 S.E.2d 131 (2010).

4. "'[C]ourts are not required to exhaust every speculative possibility of parental improvement before terminating parental rights where it appears that the welfare of the child will be seriously threatened. . . .' Syl. Pt. 1, in part, *In re R.J.M.,* 164 W.Va. 496, 266 S.E.2d 114 (1980)." Syl. Pt. 7, in part, *In re Carlita B.*, 185 W.Va. 613, 408 S.E.2d 365 (1991).

5. "Termination of parental rights, the most drastic remedy under the statutory provision covering the disposition of neglected children, [West Virginia Code § 49-4-604] may be employed without the use of intervening less restrictive alternatives when it is found that there is no reasonable likelihood under [West Virginia Code § 49-4-604(c)] that conditions of neglect or abuse can be substantially corrected." Syl. Pt. 2, *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114 (1980).

**HUTCHISON, Justice:**

In this abuse and neglect case, the Circuit Court of Ohio County entered a final dispositional order on August 31, 2018, pursuant to West Virginia Code § 49-4-604(b)(5) (2016), placing the children, N.R., A.R., and A.W.,[1] in the legal and physical custody of the West Virginia Department of Health and Human Resources ("DHHR") upon finding that the abusing parents were presently unable to adequately care for their children.[2] In these consolidated appeals, the guardian ad litem ("GAL") and DHHR argue that the circuit court erred by not terminating the mother's and father's parental rights. Conversely, the mother and father contend that the circuit court failed to comply with the Indian Child

---

[1] In cases involving minor children and sensitive facts, we use initials to identify the parties. *See* W.Va. R. App. Proc. 40(e); *see also State v. Edward Charles L.*, 183 W.Va. 641, 645 n.1, 398 S.E.2d 123, 127 n.1 (1990). In this case, one of the children and both parents have the same initials. Therefore, to avoid confusion, we refer to the child as A.R. and the parents as "mother" and "father" rather than using their initials.

[2] West Virginia Code § 49-4-604(b) provides, in pertinent part:

> The circuit court shall give precedence to dispositions in the following sequence:
> . . . .
> (5) Upon a finding that the abusing parent or battered parent or parents are presently unwilling or unable to provide adequately for the child's needs, commit the child temporarily to the care, custody, and control of the state department, a licensed private child welfare agency, or a suitable person who may be appointed guardian by the court.

1

Welfare Act ("ICWA"), 25 U.S.C. §§ 1901 to -1923 (1978), and seek dismissal of the case and the return of the children to their custody.[3]

The ICWA applies to child custody proceedings involving Indian[4] children and establishes minimum federal standards and procedural safeguards that must be followed when an Indian child is subject to placement in a foster or adoptive home. 25 U.S.C. § 1902. It is undisputed that the ICWA applies in this case because N.R. and A.R. are Indian children as defined by 25 U.S.C. § 1903.[5] Upon consideration of the parties' oral arguments and briefs, the submitted record, and applicable authorities, this Court finds no violation of the ICWA. We further find that the circuit court erred by not terminating the mother's and father's parental rights. Accordingly, we reverse, in part, and affirm, in part, the dispositional order and remand this case to the circuit court for entry of a

---

[3] All parties have appealed the circuit court's dispositional order, and each appeal has been assigned a separate docket number. The GAL's appeal is Docket No. 18-0842; DHHR's appeal is Docket No. 18-0850; the mother's appeal is Docket No. 18-0849; and the father's appeal is Docket No. 18-0854. As noted, the appeals have been consolidated for purposes of argument and decision.

[4] The term "Indian" is used in this opinion, instead of Native American, only to maintain consistency with the ICWA and applicable regulations, all of which use the term "Indian."

[5] Under 25 U.S.C. § 1903(4), "Indian child" is defined as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe[.]"

dispositional order terminating the mother's and father's parental rights in accordance with this opinion.

## I. Facts and Procedural Background

The mother is the biological parent of N.R., A.R., and A.W. The father is the biological parent of N.R. and A.R. and the stepfather of A.W.[6] The father is a member of the Manchester–Point Arenas Band of Pomo Indians; he lived on the Pomo Indian reservation in California until he was eighteen years old. Both the mother and father are former members of the United States military.

This abuse and neglect case began in 2013 when DHHR was notified that N.R. was taken to a hospital with two fractures, a classic metaphysical fracture of the left distal tibia (also referred to as a bucket handle fracture) and a healing left clavicle fracture. At that time, the child was three months old. The nature of the injuries was indicative of child abuse, and the father gave inconsistent statements regarding how N.R. was hurt. The DHHR filed the initial abuse and neglect petition against the mother and father on April 30, 2013. In addition to the allegations regarding the child's injuries, the DHHR also alleged a history of domestic violence between the mother and father.[7]

---

[6] The parental rights of A.W.'s biological father were terminated in 2014, and he is not a party in this appeal. A.W. is not an Indian child as defined by the ICWA.

[7] Prior to moving to West Virginia, the mother and father lived in Hawaii where they were also subject to abuse and neglect proceedings after the mother called the police

On May 17, 2013, DHHR was contacted by Christine Dukatz, who indicated she was the ICWA representative for the Pomo Indian tribe (hereinafter "tribe"). Ms. Dukatz stated that the father had made the tribe aware of the proceeding. DHHR provided Ms. Dukatz with all the information regarding the abuse and neglect proceeding, including the children's placement with their maternal grandparents.[8] Ms. Dukatz stated that the tribe was in agreement with the case proceeding in West Virginia[9] and the children's placement with their maternal grandparents. Ms. Dukatz indicated though that there was an approved foster family on the tribe's reservation that could take custody of the children if the placement with their maternal grandparents did not work. Ms. Dukatz said that the tribe was not seeking to intervene at that time and just wanted to be kept informed and involved in the decision-making.

At the adjudicatory hearing held on June 14, 2013, the father admitted to breaking his daughter's leg because he was frustrated, breaking her clavicle by squeezing

and reported an incident of domestic violence, stating that the father had threatened to kill her son, A.W., by choking him and had beat her. The mother required medical treatment for her injuries. After the incident, the mother moved with her children to the United States mainland to get away from the father but subsequently reunited with him and recanted her prior statements to law enforcement and child protective services in Hawaii causing the proceedings there to be closed. Thereafter, the family moved to West Virginia.

[8] As discussed more thoroughly herein, the ICWA requires the child's tribe to be notified of any abuse and neglect proceeding and provides for the tribe's participation in the case should it elect to do so. *See* 25 U.S.C. §§ 1911-1912.

[9] The ICWA provides for the transfer of the proceeding to the jurisdiction of the child's tribe in some circumstances. *See* 25 U.S.C. § 1911. In this case, the tribe did not seek to assume jurisdiction over this proceeding.

it, and lying to DHHR about what happened. The mother admitted that she and the father had engaged in domestic violence in front of the children and that the father had injured both her and her son while they were living in Hawaii. Consequently, the mother and father were adjudicated as abusive and/or neglectful parents. Thereafter, all parties agreed to post-adjudicatory improvement periods for the mother and father.

The mother initially separated from the father after he admitted to injuring N.R. In December 2013, the children were placed back in their mother's physical custody for a trial period because she appeared to be complying with the terms of her post-adjudicatory improvement period. During the trial period, the father was not permitted to have unsupervised visits with the children. Subsequently, the mother completed the terms of her improvement period; she indicated that she recognized the danger posed by the father and understood that she needed to protect the children. The petition against her was dismissed on March 28, 2014. The father's improvement period continued as did his supervised visitation.

Although the father was participating in what is now known as the Batterer's Intervention and Prevention Program ("BIPPS"), another incident of domestic violence occurred between the father and mother on April 27, 2014. According to the mother, the father was intoxicated and got into a car with her and the children where an argument ensued. The father exited the car, tore off the car door handle, entered the mother's apartment, and damaged a television and other property. The day of the incident the mother

5

refused to provide a statement to law enforcement and would not apply for a domestic violence protective order (DVPO). However, she did so the next day upon receiving advice from her attorney, and a DVPO was granted.

On May 1, 2014, the GAL filed a motion to terminate the father's improvement period. A hearing on the motion was continued until June at the father's request. In the meantime, the mother attended a multi-disciplinary team ("MDT") meeting and accused the investigating police officer of misstating what had happened during the April 27, 2014, incident. Consequently, DHHR filed a motion to modify the mother's dispositional order and add her as a respondent again in the abuse and neglect case, which continued with respect to the father. Ms. Dukatz was notified by DHHR that additional problems had arisen and was asked if the tribe wished to intervene. Ms. Dukatz indicated that she was no longer with the tribe, nor was she acting as the ICWA representative for the tribe. The DHHR then sought to contact another tribe member.

Thereafter, the father's improvement period expired, and he requested that a disposition hearing be scheduled. Instead of pursuing the motion to modify the mother's disposition, the parties agreed to allow her to receive additional services. The father's disposition hearing was scheduled but repeatedly continued because he failed to provide his medical records from a Veteran's Administration ("VA") hospital in Baltimore where he received treatment in July and August of 2014. Eventually, the records were produced. Although the father's medical records showed that he had received treatment for post-

6

traumatic stress disorder,[10] there was no indication of a causal link to the violence he exhibited towards the mother and the children.

While awaiting receipt of the father's medical records, DHHR filed a new abuse and neglect petition against the mother because her cell phone records revealed that she continued to contact the father and had an ongoing intimate relationship with him. There was also evidence that she had allowed the father to visit the children without supervision. At her second adjudicatory hearing in November 2014, the mother stipulated to most of the allegations set forth in the second petition, including the prior domestic violence.

In January 2015, yet another incident occurred when the father became involved in a fight at a bar/restaurant with another patron. He appeared to be intoxicated and became combative with a police officer who tried to place him under arrest. The mother was present and tried to intervene in the father's arrest. She was also arrested and charged with obstruction.

During this same time period, DHHR successfully contacted the tribe and was informed that Lorraine Laiwa had assumed the duties of the ICWA director and had

---

[10] The father was deployed to Iraq on two occasions. His first tour of duty was from November 2007 until February 2009, and his second tour of duty was from June 2010 until June 2011.

appointed her daughter, Liz DeRouen, as the tribe's ICWA representative in this case.[11]

Ms. DeRouen asserted that DHHR needed to do more to satisfy the "active efforts" requirement of the ICWA,[12] and at a hearing on June 4, 2015, Ms. DeRouen orally moved to intervene in the case on behalf of the tribe. At that hearing, the mother and father indicated that they intended to file motions to dismiss the abuse and neglect case because of ICWA violations. Thereafter, the motions were filed and a hearing was held in September 2015. On November 11, 2015, the circuit court entered an order finding no violations of the ICWA and denying the mother's and father's motions to dismiss.

Also in late summer of 2015, DHHR filed motions to compel the mother and father to undergo additional psychological evaluations.[13] The evaluations were conducted by Barbara Nelson, MA, and Dr. Timothy Saar of Saar Psychological Group. The psychological reports indicated the children could not be safely returned to the mother and father. Termination of parental rights was recommended.

---

[11] The record indicates that Ms. Laiwa and Ms. DeRouen are related to the father.

[12] As discussed more thoroughly herein, the ICWA requires any party seeking to effect a foster care placement or termination of parental rights of an Indian child to make "active efforts" to keep the Indian family together by providing remedial services and rehabilitation programs. *See* 25 U.S.C. § 1912(d).

[13] Prior psychological evaluations occurred in 2013.

According to the father's psychological report, during the evaluation, he denied being a risk to his children. He claimed that he had successfully completed all the treatment programs, although the records indicated otherwise. He denied that alcohol was involved in the incidents of domestic violence, despite evidence to the contrary, and stated that he had "exaggerated" his alcohol use in order to get treatment at the VA Hospital in Baltimore. He stated that none of his admissions and stipulations regarding the injuries to N.R. were true and that his attorney told him he needed to make those statements to get an improvement period. He stressed that he is a Native American and claimed that he was a victim of racial and ethnic discrimination throughout the abuse and neglect case. The father's personality assessment was indicative of obsessive-compulsive personality disorder and narcissistic personality disorder. Although the father reported his prior diagnosis of post-traumatic stress disorder, Ms. Nelson found that he did not meet the criteria for such diagnosis during the psychological evaluation. Ms. Nelson concluded that based upon the father's comments, he had not accepted any responsibility for the abuse of the children and had not benefitted from the programs, services, and treatment provided to him. The father had exhibited a pattern of alcohol abuse, aggression, and violence since at least 2011, and there was no expectation for change or parental improvement, putting the children's welfare at risk.

The same conclusion was reached with respect to the mother. Like the father, she denied there was any abuse of the children and also claimed that her husband admitted to harming N.R. only because "he had to." Likewise, she said she claimed to be afraid of

her husband because she was "forced to." Ms. Nelson concluded that the mother's chances of improved parenting were "virtually nonexistent" because she continuously chose her husband over the children despite receiving instructions and advice necessary to make the right decision. In short, Ms. Nelson concluded that the mother's decision to remain with her husband was "willful disobedience rather than ignorance." Ms. Nelson opined that further services would not be beneficial.

The results of the psychological evaluations were relayed to the circuit court by Ms. Nelson during the disposition hearing that was held over the course of several different days. In addition to testimony from Ms. Nelson, the GAL and DHHR provided testimony from numerous other witnesses in support of their position that the mother and father's parental rights should be terminated. The mother and father presented expert testimony from Dr. Al Martinez, a clinical psychologist with knowledge of the tribe's culture.[14] Notably, Dr. Martinez testified that the children would *not* be safe in the father's care and that the father needed more services. Although Dr. Martinez opined that the children could be "safely returned to their mother," he acknowledged that he was not aware that the mother and father were still together. Dr. Martinez also did not appear to have a

---

[14] Dr. Martinez testified that he regularly provides testimony in cases involving the ICWA.

complete understanding of how the case had proceeded and was unaware of some of the instances of domestic violence that had occurred.[15]

At the end of the disposition hearing, the circuit court asked the parties to prepare findings of facts and conclusions of law. Thereafter, the circuit court issued its dispositional order on August 31, 2018, terminating the mother and father's custodial rights only and placing the children in the legal and physical custody of DHHR. These appeals followed.

## II. Standard of Review

The issues presented herein require interpretation and application of the ICWA. Our standard of review for issues involving questions of law is *de novo*. *See* Syl. Pt. 1, in part, *Chrystal R.M. v. Charlie A.L.*, 194 W.Va. 138, 459 S.E.2d 415 (1995) ("Where the issue on appeal from the circuit court is clearly a question of law . . . involving an interpretation of a statute, we apply a *de novo* standard of review."). As for factual findings made by the circuit court, we employ a clearly erroneous standard of review. In that regard, this Court has long held:

> "Although conclusions of law reached by a circuit court
> are subject to *de novo* review, when an action, such as an abuse

---

[15] During his testimony, Dr. Martinez explained that he did a "brief assessment" before rendering his psychological report, "meaning that I met with them at—individually, and then together for approximately 60 to 90 minutes each. Then had a break . . . then revisited and did a second visit, both individually and then went over some of the . . . issues of the removal." It appears that the interviews all occurred during the course of one day.

11

and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, *In re Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996).

Syl. Pt. 1, *In re Cecil T.*, 228 W.Va. 89, 717 S.E.2d 873 (2011). With these standards in mind, we consider the parties' arguments.

## III. Discussion

In this case, we must interpret the ICWA and determine its proper application within the framework of our state abuse and neglect law. The ICWA was enacted in 1978 "to counteract the large scale separations of Indian children from their families, tribes, and culture through adoption or foster care placement, generally in non-Indian homes." *C.E.H. v. L.M.W.*, 837 S.W.2d 947, 951 (Mo. Ct. App. 1992). In enacting the legislation, Congress expressly found that

an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions[.]

25 U.S.C. § 1901. Thus, Congress declared that

12

> it is the policy of this Nation to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs.

25 U.S.C. § 1902. To that end, the ICWA "impose[s] more exacting requirements than a typical termination proceeding." *In re Adoption of T.A.W.*, 383 P.3d 492, 497 (Wash. 2016). Although, "[t]he Act does not deprive a state of its traditional jurisdiction over an Indian child within its venue[,] it [does] establish minimum standards and procedural safeguards designed to protect the rights of the child as an Indian and the integrity of the Indian family." *In re Maricopa Cty. Juv. Act. No. JS-8287*, 828 P.2d 1245, 1248 (Ariz. Ct. App. 1991) (quotations and citation omitted). In other words, the "ICWA does not alter the requirements for state law proceedings, but instead requires an additional finding with a higher burden of proof in cases involving termination of parental rights to Indian children." *In re K.S.D.*, 904 N.W.2d 479, 486 (N.D. 2017); *see also In re Bluebird,* 411 S.E.2d 820, 823 (N.C. Ct. App. 1992) (explaining "a dual burden of proof is created in which the state provisions and federal provisions must be satisfied separately"). Under our state law, the burden of proof for terminating parental rights is clear and convincing evidence. *See* Syl. Pt. 6, *In re Willis,* 157 W.Va. 225, 207 S.E.2d 129 (1974) ("The standard of proof required to support a court order limiting or terminating parental rights to the custody of minor children is clear, cogent and convincing proof."). Under the ICWA, the

13

burden of proof for termination of parental rights is beyond a reasonable doubt. 25 U.S.C. § 1912(f).

In addition to a heightened burden of proof, the ICWA imposes other requirements that must be satisfied before an Indian child can be removed from his or her Indian family. In their appeals, the mother and father contend that some of these requirements were not met, and, therefore, this abuse and neglect case should be "invalidated." In that regard, the ICWA provides:

> Any Indian child who is the subject of any action for foster care placement or termination of parental rights under State law, *any parent or Indian custodian from whose custody such child was removed,* and the Indian child's tribe *may petition any court of competent jurisdiction to invalidate such action upon a showing that such action violated any provision of sections 1911, 1912, and 1913 of this title.*

25 U.S.C. § 1914 (emphasis supplied).

In this case, the mother and father contend that DHHR did not comply with the notice requirements set forth in 25 U.S.C. § 1912(a); that DHHR did not satisfy the "active efforts" requirements of 25 U.S.C. § 1912(d); that the circuit court erred by not holding a hearing prior to disposition to obtain qualified expert testimony with regard to foster care placement as required by 25 U.S.C. § 1912(e); that the "qualified expert testimony" required by 25 U.S.C. § 1912(f) was not presented at the disposition hearing; and that the circuit court failed to follow the foster care placement requirements of 25 U.S.C. § 1915(b). Conversely, the GAL and DHHR maintain that there were no violations

14

of the ICWA and argue that the mother and father's parental rights should have been terminated. We consider each of these arguments in turn below.

### A. *Compliance with the ICWA*

Our analysis begins with consideration of the ICWA requirements that are the basis of the mother's and father's appeals. As set forth above, under 25 U.S.C. § 1914, an abuse and neglect proceeding may be "invalidated" if any provision of 25 U.S.C. §§ 1911, 1912, or 1913 is violated.

**1. Notice.** The mother and father first contend that DHHR failed to comply with the notice requirement set forth in 25 U.S.C. § 1912(a), which provides:

> In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention. If the identity or location of the parent or Indian custodian and the tribe cannot be determined, such notice shall be given to the Secretary in like manner, who shall have fifteen days after receipt to provide the requisite notice to the parent or Indian custodian and the tribe. No foster care placement or termination of parental rights proceeding shall be held until at least ten days after receipt of notice by the parent or Indian custodian and the tribe or the Secretary: *Provided*, That the parent or Indian custodian or the tribe shall, upon request, be granted up to twenty additional days to prepare for such proceeding.

It is undisputed that DHHR did not notify the tribe of this abuse and neglect proceeding by registered mail with return receipt requested. However, the record shows that DHHR was in the process of determining how to contact the tribe when Ms. Dukatz called and indicated that she had been informed about the proceeding by the father. The phone call occurred less than a month after the abuse and neglect petition was filed, and from that point forward, DHHR kept the tribe apprised of the proceedings and provided the requisite documentation. During the initial call, Ms. Dukatz voiced no objection to the case and expressly indicated that the tribe did not wish to intervene. While the tribe did eventually seek to intervene in this matter, it did not do so until June 2015, more than two years after the initial petition was filed. During the intervening two years, the tribe participated in MDT meetings and hearings.

The circuit court found that the tribe was not prejudiced by DHHR's failure to send notice in accordance with 25 U.S.C. § 1912(a) because it received actual notice and became involved in the proceedings. The circuit court concluded that any violation of the ICWA notice provision had been remedied and did not warrant dismissal of the case. We agree.

Without question, "[n]otice is a key component of the congressional goal to protect and preserve Indian tribes and Indian families." *In re Kahlen W.*, 285 Cal. Rptr. 507, 511 (Cal. Ct. App. 1991). "The requisite notice to the tribe serves a twofold purpose: (1) it enables the tribe to investigate and determine whether the minor is an Indian child;

16

and (2) it advises the tribe of the pending proceedings and its right to intervene or assume tribal jurisdiction." *In re Desiree F.*, 99 Cal. Rptr. 2d 688, 695 (Cal. Ct. App. 2000). While notice is mandatory, courts have held that when a tribe receives actual notice of the proceeding, there has been substantial compliance with 25 U.S.C. § 1912(a). In other words, "failure to provide the required notice requires remand *unless the tribe has participated in the proceedings or expressly indicated they have no interest in the proceedings." In re Kahlen W.*, 285 Cal. Rptr. at 513 (emphasis supplied). In those circumstances, the error is considered harmless because the tribe was aware of the proceeding and was able to exercise its right to participate. *Id.; see also In re M.B.*, 176 P.3d 977, 984 (Kan. Ct. App. 2008) ("[E]ven if the provisions of the ICWA are not initially followed, subsequent remedial action . . . may bring a termination of parental rights case into compliance with the requirements of the Act.").

For example, in *In re H.A.M.*, 961 P.2d 716 (Kan. Ct. App. 1998), the Chickasaw Indian Nation was not given notice of a child custody proceeding involving three Indian children who were eligible for tribe membership until two years after they were placed in protective custody by the Kansas Department of Social and Rehabilitation Services. At that juncture, the tribe became involved in the case, but eventually, parental rights were terminated. On appeal, the parents sought reversal of the termination decision based on the untimely notice given to the tribe. The Kansas court found the error did not necessitate reversal, explaining that "[c]onsidering the Chicasaw Nation's involvement in this case, albeit belated, there was substantial compliance with the ICWA purpose of

17

involving the tribe in the child care proceedings." *Id.* at 720; *see also In re Dependency and Neglect of A.L.*, 442 N.W.2d 233, 236 (S.D. 1989) (finding tribe was properly notified even though it did not receive registered notice because it had actual notice); *In re B.J.E.*, 422 N.W.2d 597, 600 (S.D. 1988) (actual notice that ongoing petition involved newborn was sufficient compliance with ICWA).

In this case, the tribe received actual notice of the proceeding and became involved in the case less than a month after the initial petition was filed. The tribe participated in MDT meetings, hearings, and eventually exercised its right to intervene. Accordingly, we find no basis to invalidate this action under 25 U.S.C. § 1912(a).

2. **Active Efforts.** The mother and father next argue that DHHR failed to make "active efforts" to keep their family together as required by 25 U.S.C. § 1912(d), which provides in pertinent part:

> Any party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.

The mother and father contend that DHHR failed to provide any cultural accommodation and failed to make any efforts exceeding its typical "reasonable efforts" to provide services to them. Rejecting this argument below, the circuit court found that "active efforts" were made by the DHHR, and it was not required to provide "culturally sensitive services."

18

The ICWA does not define "active efforts" and does not set forth any guidance with regard to the amount of services that must be provided before parental rights may be terminated. *In re Adoption of T.A.W.*, 383 P.3d at 498. Courts that have examined the issue of what constitutes "active efforts" have generally concluded that the ICWA "seems to only require that timely and affirmative steps be taken to accomplish the goal which Congress has set: to avoid the breakup of Indian families whenever possible by providing services designed to remedy problems which might lead to severance of the parent-child relationship." *Letitia V. v. Super. Ct.*, 97 Cal. Rptr. 2d 303, 309 (Cal. Ct. App. 2000). Nonetheless, courts have recognized that "the term active efforts, by definition implies heightened responsibility compared to passive efforts." *In re A.N.*, 106 P.3d 556, 560 (Mont. 2005); *see also State ex rel. C.D. v. State,* 200 P.3d 194, 206 (Utah Ct. App. 2008) ("[T]he phrase active efforts connotes a more involved and less passive standard than that of reasonable efforts."). Because "no pat formula exists for distinguishing between active and passive efforts," determining whether there was a sufficient attempt at reunification requires a case-by-case analysis. *Chloe W. v. State Dep't. of Health & Soc. Serv., Office of Children's Serv.*, 336 P.3d 1258, 1268 (Alaska 2014) (internal quotations and citations omitted); *see also State ex rel. C.D.,* 200 P.3d at 206 ("determination of whether [] ['active efforts'] standard has been met should be made on a case-by-case basis"). It is clear, however, that the ICWA does not require the DHHR "to engage in futile, nonproductive efforts to reunify th[e] Indian family." *In re Annette P.*, 589 A.2d 924, 929 (Me. 1991); *see, e.g.*, *A.M. v. State*, 945 P.2d 296 (Alaska 1997) (parent's lack of willingness to participate a factor in determining sufficiency of remedial efforts); *In re*

19

*L.N.W.*, 457 N.W.2d 17 (Iowa Ct. App. 1990) (active but unsuccessful efforts made to reunify family because of mother's lack of cooperation); *People in Interest of S.R.*, 323 N.W.2d 885 (S.D. 1982) (active efforts requirement satisfied where mother provided various types of assistance and direction for caring for child but exhibited no interest in proffered help).

In this case, the record shows that DHHR made available a variety of services to the mother and father and assisted with their participation in those programs. In particular, the mother and father were provided parenting classes, supervised visitations with the children, adult life skills classes, psychological evaluations, and counseling. In addition, the father was enrolled in COPE classes for anger management, although he only attended a few times. The mother was offered domestic violence victim classes but chose not to participate. During his improvement period, the father elected to seek treatment through VA centers located in West Virginia, Ohio, Pennsylvania, and Maryland rather than participate in DHHR's counseling services. DHHR did not object. In fact, when the father moved to Pennsylvania for a short time to attend therapy at the VA center in Pittsburgh, DHHR transported him to and from West Virginia so that he could participate in other services and visitation with the children. The mother also sought treatment at VA centers in West Virginia and Ohio. DHHR also helped the mother obtain housing, supplies for her home, and food stamps. She was provided with Medicaid for most of 2014, and the children were provided medical cards. All these services and programs were aimed at reunifying the family.

20

Given the extensive services that were provided to the mother and father, we find no merit to their argument that DHHR failed to make active efforts to keep the family together as required by the ICWA. While the mother and father maintain that DHHR should have provided "culturally sensitive services," there is no such requirement under the ICWA. To support their argument, the mother and father rely upon the 2015 guidelines for interpreting the ICWA issued by the United States Department of the Interior, Bureau of Indians Affairs ("BIA").[16] However, their reliance is misplaced because the guidelines were not in effect at the time DHHR began providing the mother and father services. More importantly, the subsequent binding regulations promulgated by the BIA based upon those guidelines make clear that active efforts[17] are "to be tailored to the facts and circumstances of the case" and only to the "extent possible" should active efforts "be provided in a manner consistent with the prevailing social and cultural conditions and way of life of the Indian child's Tribe." 25 C.F.R. § 23.2 (2016). While the tribe's ICWA representative, Ms.

---

[16] When the ICWA was enacted, the BIA issued guidelines providing its interpretation of the Act to assist state courts in its application. *See* Guidelines for State Courts in Indian Custody Proceedings, 44 Fed. Reg. 67,584 (Nov. 26, 1979). In 2015, the BIA promulgated additional, updated guidelines because of the inconsistent interpretation and implementation of the ICWA among the states over the past thirty years. *See* Guidelines for State Courts and Agencies in Indian Child Custody Proceedings, 80 Fed. Reg. 10,146 (Feb. 25, 2015). Following a notice and comment period, a final rule with binding regulations was issued in 2016 along with a new set of nonbinding guidelines that replaced the 1979 and 2015 guidelines. *See* Indian Child Welfare Act Proceedings Final Rule, 81 Fed. Reg. 38,778 (June 14, 2016); 25 C.F.R. §§ 23.1 to -23.144 (2016).

[17] A definition of "active efforts" is now provided by 25 C.F.R. § 23.2 (2016). The regulation defines "active efforts" as "affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child with his or her family." *Id.*

21

DeRouen, provided a list of culturally appropriate providers to DHHR, none of them were located in West Virginia. Attempting to utilize service providers who were located hundreds of miles away was simply not feasible and not necessary given the fact that neither the mother nor the children have ever resided with or near the tribe. The services provided by the DHHR were tailored to address the severe physical abuse and domestic violence that was the conduct giving rise to this abuse and neglect proceeding. Thus, the active efforts requirement of the ICWA was satisfied.

**3. Expert testimony to support foster care placement prior to disposition.** The mother and father next argue that the circuit court violated the ICWA by not holding a hearing pursuant to 25 U.S.C. § 1912(e) to determine whether the initial placement of the children in foster care was necessary to prevent serious emotional or physical damage to the children. The ICWA provides:

> No foster care placement may be ordered in such proceeding in the absence of a determination, supported by clear and convincing evidence, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

25 U.S.C. § 1912(e). "Foster care" is defined by the ICWA as

> any action removing an Indian child from its parent or Indian custodian for temporary placement in a foster home or institution or the home of a guardian or conservator where the parent or Indian custodian cannot have the child returned upon demand, but where parental rights have not been terminated[.]

22

25 U.S.C. § 1903(1)(i). The mother and father concede that emergency removal of Indian children may occur without prior expert testimony,[18] but argue that such testimony is required thereafter based upon the definition of "foster care" set forth in the ICWA. In other words, the mother and father contend that such testimony must occur before the disposition phase.

The ICWA does not provide a specific time frame for submission of the evidence required by 25 U.S.C. § 1912(e); however, other courts have generally considered such evidence at the adjudicatory stage. As one court has explained, "[t]he [ICWA] requires qualified expert testimony both in child-custody proceedings (here, the adjudicatory phase at which the children may be temporarily placed in State custody) and for termination of parental rights. 25 U.S.C. § 1912(e)." *In re L.M.B.*. 398 P.3d 207, 222 (Kan. Ct. App. 2017); *see also In re Esther V.*, 248 P.2d 863, 874 (N.M. 2011) (explaining that similarities between New Mexico's adjudicatory hearing requirements and ICWA's involuntary foster care placement requirements make adjudicatory hearing best procedural phase to make findings required by 25 U.S.C. § 1912(e)).

---

[18] *See* 25 U.S.C.A. § 1922 ("Nothing in this subchapter shall be construed to prevent the emergency removal of an Indian child . . . from his parent or Indian custodian or the emergency placement of such child in a foster home or institution, under applicable State law, in order to prevent imminent physical damage or harm to the child.").

Although the testimony and evidence required by 25 U.S.C. § 1912(e) was not provided at the adjudicatory hearings in this case, the circuit court found no violation of the ICWA. The circuit court concluded that the mother's and father's stipulations at the adjudicatory hearing established that the children were properly removed through an emergency custody proceeding and placed in foster care because they were likely to suffer physical or emotional damage. The circuit court explained that although expert testimony was available from the physicians who had treated N.R. for her broken bones, DHHR did not need to present the evidence because the father admitted to causing the injuries. In particular, the father admitted that "he grabbed [N.R.'s] leg at a time when he was frustrated and caused the bucket handle fracture; he also squeezed her on a prior occasion, resulting in the clavicle fracture." He said that "he was going through a lot and lost control." In addition, the mother acknowledged that she and the father had engaged in domestic violence while the children were present and that the father's actions caused physical, mental, and emotional injuries to her and the children.[19] Based on these stipulations, the mother and father were adjudicated as abusing parents, and the children were found to be abused children.

Upon review, we find no error with the circuit court's determination that the mother's and father's stipulations alleviated the need for the expert testimony required by

---

[19] The mother made similar stipulations at the adjudicatory hearing for the 2014 petition.

25 U.S.C. § 1912(e) at the adjudicatory hearing. The record shows that the court questioned the parents to ensure there was no coercion and that their stipulations were made voluntarily. The court made clear to them that their parental rights could be terminated and both indicated that they understood. *See In re Esther V.*, 248 P.2d at 876-77 (holding court must ensure parental admission is voluntary before accepting it to make 25 U.S.C. 1912(e) finding).

Even if there was a violation of 25 U.S.C. § 1912(e) because of the circuit court's failure to require expert testimony at the adjudicatory phase, we find that the error was harmless because such testimony was provided during the disposition phase. As discussed below, expert testimony was provided by DHHR at the disposition hearing that indicated the children would likely suffer serious emotional or physical damage if returned to the mother and father's custody. When such testimony is provided to support termination of parental rights pursuant to 25 U.S.C. § 1912(f), the failure to provide testimony pursuant to 25 U.S.C. § 1912(e) is harmless because

> the burden of proof that was required at termination (beyond a reasonable doubt) was higher than what was needed at adjudication (clear and convincing evidence) . . . [therefore] qualified expert testimony at the termination hearing effectively cured any possible harm that resulted from not having such testimony at the adjudication stage.

*In re L.M.B.*, 398 P.3d at 223; *see also In re Enrique P.*, 709 N.W.2d 676 (Neb. Ct. App. 2006) (failure to provide expert testimony at adjudication harmless because evidence

25

adduced at disposition clearly and convincingly supported a finding of harm).

Accordingly, we find no merit to this argument.

**4. Qualified expert testimony at disposition.** The mother and father also argue that the expert testimony provided by DHHR during the disposition phase was not sufficient under the ICWA to support the circuit court's finding that the evidence proved beyond a reasonable doubt that restoring their custodial rights would likely result in serious emotional or physical damage to the children. Pursuant to 25 U.S.C. § 1912(f),

> [n]o termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

The mother and father contend that "qualified expert witness" means an expert who has knowledge of the social and cultural standards of the child's tribe. Because DHHR's experts, Ms. Nelson and Dr. Saar, had no such knowledge, the mother and father argue that they were not "qualified expert witnesses" under 25 U.S.C. § 1912(f).

The phrase "qualified expert witness" is not defined by the ICWA. However, 25 C.F.R. § 23.122(a) (2016), which became effective prior to the disposition hearing in this case, provides, in pertinent part:

> A qualified expert witness *must be* qualified to testify regarding whether the child's continued custody by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child and *should be* qualified to testify

26

as to the prevailing social and cultural standards of the Indian child's tribe.

(Emphasis supplied.) Notably, the phrases "must be" and "should be" are both used within the definition, with the latter pertaining to the testimony regarding the prevailing social and cultural standards of the Indian child's tribe. The phase "should be" suggests that state courts have discretion to determine whether such testimony is required given the particular circumstances of the case. Indeed, the BIA made clear that courts have such discretion when it explained the parameters of the testimony to be provided by the qualified expert witness. The BIA has stated:

> The final rule requires that the qualified expert witness must be qualified to testify regarding whether the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child. This requirement flows from the language of the statute requiring a determination, supported by evidence . . ., including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.
>
> . . . .
>
> The final rule does not, however, strictly limit who may serve as a qualified expert witness to only those individuals who have particular Tribal social and cultural knowledge. The Department recognizes that there may be certain circumstances where a qualified expert witness need not have specific knowledge of the prevailing social and cultural standards of the Indian child's Tribe in order to meet the statutory standard. For example, a leading expert on issues regarding sexual abuse of children may not need to know about specific Tribal social and cultural standards in order to testify as a qualified expert witness regarding whether return of a child to a parent who has a history of sexually abusing the child is likely to result in serious emotional or physical damage to the child. Thus, while a qualified expert witness should normally be required to have

27

knowledge of Tribal social and cultural standards, that may not be necessary *if such knowledge is plainly irrelevant to the particular circumstances at issue in the proceeding.*

81 Fed. Reg. 38,778, 38,829-30 (June 14, 2016) (citations omitted and emphasis supplied).

Clearly, a "qualified expert witness" under the ICWA is not required to have specialized knowledge of tribal social and cultural standards in every instance. Whether an expert with such knowledge is required depends on the particular circumstances that are the basis of the termination proceeding. This approach is consistent with the case law prior to the enactment of the regulation in 2016. *See, e.g., K.E. v. State*, 912 P.2d 1002, 1005 (Utah Ct. App. 1996) (noting that "professionals having substantial education and experience in child welfare might well qualify as expert witnesses under [ICWA], even though their experience with Indians is limited"); *In re Baby Boy Doe*, 902 P.2d 477, 485 (Idaho 1995) (stating "[s]pecial knowledge of Indian life is not necessary where a professional person has substantial education and experience and testifies on matters not implicating cultural bias" (internal quotations and citations omitted)); *State ex rel. Children's Serv. Div. v. Campbell*, 857 P.2d 888, 889 (Or. Ct. App. 1993) (explaining cultural bias clearly not implicated in case involving mentally ill mother, therefore, "necessary proof may be provided by expert witnesses who do not possess special knowledge of Indian life" (internal quotations and citations omitted); *In re N.L.*, 754 P.2d 863, 868 (Okla. 1988) (stating cultural bias clearly not implicated in shaken baby syndrome case so expert witnesses who do not possess special knowledge of Indian life may provide

the necessary proof that continued custody of child by parent will result in serious emotional or physical harm).

In this case, the basis for removing the children from the mother and father's custody was severe physical abuse and domestic violence. The GAL and DHHR sought termination of the father's parental rights because he was the perpetrator of the abuse; he refused to acknowledge the abuse; and he failed to successfully complete his improvement period. With respect to the mother, the GAL and DHHR sought termination of her parental rights because of her refusal to acknowledge the abuse and the potential risk to the children caused by her continued relationship with the father. Cultural bias was simply not implicated, and under these circumstances, DHHR was not required to present testimony from an expert with knowledge of the tribe's social and cultural standards. Accordingly, we find no merit to the mother and father's argument that DHHR failed to provide qualified expert testimony pursuant to the 25 U.S.C. § 1912(f).

**5. Placement in ICWA compliant foster care.** Finally, the mother and father seek to invalidate this proceeding under the ICWA because the children are currently placed in two separate, non-Indian foster homes. They assert that this placement does not comply with 25 U.S.C. § 1915(b), which provides:

> Any child accepted for foster care or preadoptive placement shall be placed in the least restrictive setting which most approximates a family and in which his special needs, if any, may be met. The child shall also be placed within reasonable proximity to his or her home, taking into account

any special needs of the child. In any foster care or preadoptive placement, a preference shall be given, in the absence of good cause to the contrary, to a placement with—

(i) a member of the Indian child's extended family;

(ii) a foster home licensed, approved, or specified by the Indian child's tribe;

(iii) an Indian foster home licensed or approved by an authorized non-Indian licensing authority; or

(iv) an institution for children approved by an Indian tribe or operated by an Indian organization which has a program suitable to meet the Indian child's needs

We find no merit to this argument for two reasons.

First and foremost, an Indian child's foster care placement is not a basis to invalidate an abuse and neglect proceeding under the ICWA.

> [T]he act does not make the violation of the placement preferences a basis for dismissing a petition for termination. ICWA provides that an Indian child who is the subject of foster care placement or parental rights termination, the parent of the child or an Indian custodian may petition the court to invalidate the court's action "upon a showing that such action violated any provision of [25 U.S.C. §§ 1911, 1912, 1913]." Failure to comply with the foster care placement preferences in § 1915(b) is not a basis for invalidating a court order terminating parental rights. 25 U.S.C. § 1914.

*State ex rel. Juvenile Dep't. of Multnomah Cty. v. Woodruff*, 816 P.2d 623, 625 (Or. Ct. App. 1991) (footnote omitted). Second, the record reflects the children were placed with their maternal grandmother and step-grandfather in accordance with 25 U.S.C. § 1915(b)(i) during almost all of the proceedings below. The placement with the grandparents was not

challenged by the mother and father or the tribe. In fact, Ms. Dukatz expressed approval of the children's placement with their maternal grandparents when she first contacted DHHR.

The record indicates that in the summer of 2018, just a few weeks before the dispositional order was entered, the children's placement with their grandparents was disrupted because the mother and father took them from the grandparents' home and fled to Ohio.[20] The grandparents did not report to DHHR or the police that the children had been taken from them. Upon learning that the children were in Ohio with their mother and father, DHHR, with police assistance, removed the children and brought them back to West Virginia. The children were then placed in two separate foster homes[21] but were subsequently reunited when a foster home that could accommodate all three became available. Thereafter, A.W.'s placement was again disrupted, and he was moved to a separate foster home. According to the Rule 11 status updates,[22] the children are now residing in two separate, non-relative, non-Indian foster homes but have regular visitation with each other.

---

[20] It appears that the mother and father were living in Ohio at this time.

[21] Ironically, the mother and father told DHHR that they took the children because their step-grandfather has post-traumatic stress disorder and was aggressive with one of the children. According to DHHR, the children were not returned to their grandparents because of the mother and father's allegations with respect to the step-grandfather and because the grandparents did not report that the children had been taken from their home.

[22] *See* W.Va. R. App. Proc. 11(j).

The record indicates that the circuit court has now stayed all proceedings with respect to placement pending this appeal. While the mother and father argue that the children should be placed with a foster family that resides on the tribe's reservation in California, there has been no hearing before the circuit court to determine the suitability of that placement. Until the circuit court makes such a determination, the matter will not be addressed by this Court.[23] *See* Syl. Pt. 1, *Mowery v. Hitt*, 155 W.Va. 103, 181 S.E.2d 334 (1971) ("In the exercise of its appellate jurisdiction, this Court will not decide nonjurisdictional questions which were not considered and decided by the court from which the appeal has been taken.").

Having found no merit to the mother's and father's appeals,[24] we now consider the appeals of the GAL and DHHR.

---

[23] According to the GAL and DHHR, the children have repeatedly stated they do not wish to be moved to California to live on the tribe's reservation and, instead, want to be placed back in the custody of their maternal grandparents. The GAL and DHHR also note that there is no basis to send A.W. to California as he is not an Indian child. Finally, they point out that the ICWA indicates that the children should be placed in close proximity to their home. *See* 25 U.S.C. § 1915(b). We note that the ICWA provides for consideration of the children's preference with regard to placement and allows for a "good cause" determination to depart from the placement preferences. *See* 25 U.S.C. § 1915; 25 C.F.R. §§ 23.131-32 (2016). These are matters for the circuit court's consideration during the permanent placement hearing.

[24] The mother also assigned error to the circuit court's failure to apply the exclusionary rule to preclude admission of certain evidence at the preliminary hearing on the second abuse and neglect petition filed against her. The record shows that DHHR learned of the mother's continued relationship with the father in 2014 when her cell phone was seized by a police officer who testified that he stopped the mother's vehicle because her license plate was obstructed by a license plate frame. The mother's cell phone

### B. Disposition

In their appeals, the GAL and DHHR contend that the circuit court erred by only terminating the mother's and father's custodial rights pursuant to West Virginia Code § 49-4-604(b)(5). They maintain that the circuit court made all the requisite findings for termination of parental rights under West Virginia Code § 49-4-604(b)(6). That disposition provision provides for the termination of parental, custodial, and guardianship rights and responsibilities of the abusing parents "[u]pon a finding that there is no reasonable likelihood that the conditions of neglect or abuse can be substantially corrected in the near future and, when necessary for the welfare of the child[.]" *Id.* Upon review, we agree that the circuit court should have terminated parental rights.

---

contained images of marijuana and evidence of contact with the father which led to the filing of the second abuse and neglect petition against her. During the preliminary hearing, the mother objected to the submission of the cell phone evidence arguing that it was obtained during an illegal stop. Upon review, we find no error in the circuit court's refusal to apply the exclusionary rule. Even if we assume for argument's sake that there was an illegal stop, this Court has held that the exclusionary rule does not apply to civil matters. *See* Syl. Pt. 3, *Miller v. Toler*, 229 W.Va. 302, 729 S.E.2d 137 (2012) (holding exclusionary rule did not apply to a civil, administrative driver's license revocation or suspension proceeding). While the mother urges us to extend the exclusionary rule to abuse and neglect proceedings because parental rights are implicated, we decline to do so because of the potential harm to the children. *See Abid v. Abid*, 406 P.3d 476, 481 (Nev. 2017) (explaining that courts routinely hold that evidence obtained in violation of Fourth Amendment is admissible in abuse and neglect proceedings because "the substantial social costs of ignoring children's safety exceeds the minimal additional deterrence achieved by applying the exclusionary rule" (internal quotations and citations omitted)); *In re Mary S.*, 230 Cal. Rptr. 726, 728 (Cal. Ct. App. 1986) ("[T]he potential harm to children in allowing them to remain in an unhealthy environment outweighs any deterrent effect which would result from suppressing evidence unlawfully seized." (internal quotation marks omitted)).

In the final dispositional order, the circuit court found that the GAL and DHHR presented evidence that established beyond a reasonable doubt that returning custody to the mother and father would likely result in serious emotional and/or physical damage to the children, satisfying the heightened burden of proof imposed by the ICWA as discussed above, as well as our state law. In that regard, the circuit court's order includes the following findings of fact:

> [T]here has not been a full acknowledgement of the violence, danger and harm to the children by either [mother or father].

> [T]he [mother and father] have not remedied the issues which led to the abuse and neglect of their children. At this time, it appears that [] [m]other does not intend to separate from [the father], despite the need for her to do so and despite [the] number of chances CPS or this Court has given her to do so.

> [The mother and father] were provided more than enough time to remedy these issues.

> [T]he Court believes that additional improvement efforts for [the mother] would be futile. The first term of any improvement period would be that she discontinue involvement with [the father], and she has testified and evidenced that she has no present intent to do so.

> [G]ranting an additional improvement period or ongoing services would cause further delay in this case, and the same is not warranted and would be contrary to the law.

> [T]he WVDHHR and GAL have proven beyond a reasonable doubt the continued custody of the children by the Respondent Father is, at this time likely to result in serious emotional or physical damage to the children, and this is supported by the testimony of all the qualified expert witnesses in this case.[25]

---

[25] The circuit court found Ms. Nelson, Dr. Saar, and Dr. Martinez were all "qualified expert witnesses" under the ICWA.

34

[T]he WVDHHR and GAL have also proven beyond a reasonable doubt that the continued custody of the children by the Respondent Mother at this time is likely to result in serious emotional or physical damage to the children, and this is supported by the testimony of qualified expert witnesses who testified in this case. Although Dr. Martinez opined in his report that the children may be able to return safely to the mother's care, this was based upon his mistaken belief she was separated from Respondent Father. That is admittedly not true. Given Dr. Martinez's opinion that the children could not safely be returned to the father, it follows that the children cannot be safely returned to the mother who continues to reside with the father.

[R]eturn of the children to the [mother and father] would subject the children to substantial and immediate danger or threat of danger at this time.

[A]lthough committed efforts to remedy the issues which led to the removal of the children appear to have been repeatedly initiated by both [mother and father], neither [] has followed through with these efforts to completion with the goal of accomplishing long term change.

(Footnote added).

With respect to correcting the conditions of abuse and neglect, it has long been established that

in order to remedy the abuse and/or neglect problem, the problem must first be acknowledged. Failure to acknowledge the existence of the problem, i.e., the truth of the basic allegation pertaining to the alleged abuse and neglect or the perpetrator of said abuse and neglect, results in making the problem untreatable and in making an improvement period an exercise in futility at the child's expense.

35

*W. Va. Dep't. of Health & Human Res. v. Doris S.*, 197 W.Va. 489, 498, 475 S.E.2d 865, 874 (1996). While the circuit court recognized the mother's and father's failure to acknowledge the abuse, it inexplicably determined that they should have yet another chance to be involved in the children's lives. Specifically, the circuit court concluded that

> it is in the best interest of the children for the [mother and father] to be placed on a Disposition 5, as contemplated by W.Va. Code § 49-4-604(b)(5) which shall continue until [the mother and father] have both carried their burden of proving that they both truly and honestly acknowledge the issues which led to the removal of their children from their custody and until they have carried their burden of proving that they have made a concerted and committed, long term effort to correct the same.

This conclusion is not supported by the circuit court's own findings or the record in this case. Moreover, it is contrary to the ICWA standard for terminating parental rights and our statutory and case law.

We have recognized that "[a]lthough parents have substantial rights that must be protected, the primary goal in cases involving abuse and neglect, as in all family law matters, must be the health and welfare of the children." Syl. Pt. 3, *In re Katie S.*, 198 W.Va. 79, 479 S.E.2d 589 (1996). Indeed, "'"[i]n a contest involving the custody of an infant the welfare of the child is the polar star by which the discretion of the court will be guided." Syl. pt. 1, *State ex rel. Cash v. Lively*, 155 W.Va. 801, 187 S.E.2d 601 (1972).' Syllabus Point 4, *State ex rel. David Allen B. v. Sommerville*, 194 W.Va. 86, 459 S.E.2d 363 (1995)." Syl. Pt. 2, *In re Kaitlyn P.*, 225 W.Va. 123, 690 S.E.2d 131 (2010). Accordingly, this Court has held that

36

"courts are not required to exhaust every speculative possibility of parental improvement before terminating parental rights where it appears that the welfare of the child will be seriously threatened. . . ." Syl. Pt. 1, in part, *In re R.J.M.,* 164 W.Va. 496, 266 S.E.2d 114 (1980).

Syl. Pt. 7, in part, *In re Carlita B.*, 185 W.Va. 613, 408 S.E.2d 365 (1991). Moreover,

[t]ermination of parental rights, the most drastic remedy under the statutory provision covering the disposition of neglected children, [West Virginia Code § 49-4-604] may be employed without the use of intervening less restrictive alternatives when it is found that there is no reasonable likelihood under [West Virginia Code § 49-4-604(c)] that conditions of neglect or abuse can be substantially corrected.

Syl. pt. 2, *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114 (1980). Under West Virginia Code

§ 49-4-604(c),

"[n]o reasonable likelihood that conditions of neglect or abuse can be substantially corrected" means that, based upon the evidence before the court, the abusing adult or adults have demonstrated an inadequate capacity to solve the problems of abuse or neglect on their own or with help.

Such conditions exist when

[t]he abusing parent or parents have not responded to or followed through with a reasonable family case plan or other rehabilitative efforts of social, medical, mental health or other rehabilitative agencies designed to reduce or prevent the abuse or neglect of the child, as evidenced by the continuation or insubstantial diminution of conditions which threatened the health, welfare, or life of the child[.]

W.Va. Code § 49-4-604(c)(3).

Here, the evidence established beyond a reasonable doubt that returning custody of the children to the mother and father would likely result in emotional and

37

physical damage to the children. The evidence also showed that there was no reasonable likelihood that the conditions of abuse could be substantially corrected in the near future. The circuit court found that the mother and father failed to demonstrate a full acknowledgement and/or understanding of the issues that led to the removal of their children and failed to demonstrate the ability to follow through with long term correction of the same. Despite improvement periods and myriad services and programs provided over the course of five years and multiple opportunities to correct the conditions of abuse and neglect, the mother and father failed to do so. We have explained that

> although it is sometimes a difficult task, the trial court must accept the fact that the statutory limits on improvement periods (as well as our case law limiting the right to improvement periods) dictate that there comes a time for a decision, because a child deserves resolution and permanency in his or her life[.]

*State ex rel. Amy M. v. Kaufman*, 196 W.Va. 251, 260, 470 S.E.2d 205, 214 (1996). The GAL and DHHR satisfied their dual burden of proof under the ICWA and our state law. Given that children have a right to eventual permanency, the best interests of N.R., A.R., and A.W. require termination of the mother's and father's parental rights pursuant to West Virginia Code § 49-4-604(b)(6).

## IV. Conclusion

For the foregoing reasons, the August 31, 2018, order of the Circuit Court of Ohio County is reversed only insofar as it orders disposition under West Virginia Code § 49-4-604(b)(5), and this case is remanded for entry of a final dispositional order

38

terminating the mother's and father's parental rights pursuant to West Virginia Code § 49-4-604(b)(6).

Affirmed, in part, reversed, in part, and remanded with directions.